[Nos. 30479, 30480. Department Two. May 5, 1949.]

FEDERAL OLD LINE LIFE INSURANCE COMPANY (MUTUAL), *Respondent,* v. WILLIAM A. SULLIVAN, *as Insurance Commissioner, Appellant.*

E. C. WOEPSE, *Respondent,* v. WILLIAM A. SULLIVAN, *as Insurance Commissioner, Appellant.*[1]

[1]Reported in 206 P. (2d) 311.

*The Attorney General* and *John Spiller, Lucile Lomen, Robert D. Williams,* and *Dan Sullivan, Assistants,* for appellant.

*Davis & Riese, Emory & Howe,* and *J. R. Cissna,* for respondent.

ROBINSON, J.—This is an appeal from a decree entered after the trial of two actions brought against the state insurance commissioner, and consolidated for trial upon the representations of the parties to both actions that the controversies grew out of the same facts and presented substantially the same legal questions.

One of the actions was brought by the Federal Old Line Life Insurance Company (Mutual), a corporation, which was first authorized by the state of Washington to do business as a mutual life insurance company in 1937. The principal averments of the complaint were as follows:

(1) That, on November 30, 1946, the defendant commissioner caused an examination to be made of the affairs of the plaintiff company;

(2) That, on or about April 1, 1947, the commissioner caused to be issued to plaintiff company a license and certificate of authority, authorizing it to engage in the insurance business in the state of Washington during the year 1947;

(3) That thereafter, on the 30th day of April, 1947, the commissioner issued to the company a notice that he would deny to it the use of any of the contingent liability of its policyholders as an admitted asset;

(4) That such notice also claimed that a deficiency existed, as shown by the company's annual statement as of December 31, 1946, and required the company to make good the alleged deficiency within the next succeeding ninety days;

(5) That the company complied with the said notice, and gave due and proper notice to the commissioner that it had done so;

(6) That thereafter, on or about the 4th day of September, 1947, the commissioner issued an order by the terms of which notice was given to the company that its license and certificate of authority would be revoked after the expiration of ten days;

(7) That written notices to the same effect were sent to all agents of the company;

(8) That, on the 4th day of September, 1947, defendant commissioner commenced an action against the company in the superior court of the state of Washington, for King county, alleging that the company did not comply with the ninety-day notice, hereinabove referred to;

(9) That, because of said noncompliance, the plaintiff company was deemed to be insolvent;

(10) That, in said King county action, the commissioner obtained a temporary restraining order which purported to restrain the company from the transaction of its business, with certain exceptions;

(11) That the company procured a modification of said restraining order on September 6, 1947, the effect of which was to allow the company to continue operations upon a normal basis *pendente lite*;

(12) That the commissioner also procured from the superior court of King county an order requiring the company to show cause why he should not take possession of its property; and

(13) That the company is solvent, with more assets than liabilities, and has complied with the ninety-day notice, above referred to, and that the threatened revocation of the company's license and certificate of authority is arbitrary and capricious.

Further alleging that the revocation of its license and certificate of authority would result in irrevocable damage and injury to itself, its policyholders, its employees, and the public, the plaintiff prayed that the defendant should be enjoined and restrained from revoking the license, or from taking any action, or allowing any action to be taken, pursuant to the said notice of intention to revoke. The plaintiff company further prayed that the commissioner be re-

strained from taking any further or additional steps toward cancellation or suspension of the license or certificate of authority of the plaintiff to transact business in the state of Washington.

The second of the two actions consolidated for trial was instituted by E. C. Woepse against William A. Sullivan, insurance commissioner. The plaintiff in this action was an agent of the Federal Old Line Life Insurance Company (Mutual) and brought the action in his own behalf and on behalf of all other persons licensed by the state as agents for that company. The principal allegations of the complaint in the action are to the effect:

(1) That, on or about September 8, 1947, he and all other agents of the Federal Old Line Life Insurance Company (Mutual) received notices from the defendant purporting to cancel and terminate their licenses to solicit insurance business in the state of Washington;

(2) That, a few days prior to the issuance of these notices, the defendant had commenced an action in the superior court of King county, alleging a deficiency in the assets of the insurance company, and asking that its affairs be put into his hands;

(3) That the insurance company is concurrently filing an action in the superior court of Thurston county, asking that the commissioner be restrained from suspending its right to do business in the state, pending a hearing of the action;

(4) That immediate and irreparable damages would be sustained by the plaintiff and his fellow-agents if their licenses were suspended before the main issues were determined in the controversy between the Federal Old Line Life Insurance Company (Mutual) and the commissioner; and

(5) That no cause exists for the suspension or revocation of the licenses of the plaintiff and the other agents, and that the action of the commissioner, in threatening to cancel or revoke their licenses, is arbitrary and capricious.

Plaintiff prayed for an injunction *pendente lite,* and for a decree declaring that the notices of cancellation of his

own and his fellow-agents' licenses be null and void, and of no force or effect whatever.

In answering the complaints, the defendant commissioner admitted the service of the notices therein referred to, but categorically denied that the insurance company had complied with the requirements of the notice of April 30, 1947, and further denied the following allegation of paragraph IX of the insurance company's complaint.

"On September 4, 1947, the plaintiff company was fully solvent in that its admitted assets were in excess of its liabilities."

The two actions, above digested, having been consolidated for trial, came on for hearing on September 15, 1947. Four days were devoted to the reception of evidence. Of the evidence, the trial court said, in its memorandum opinion filed on October 7, 1947:

"A mass of evidence, both oral and documentary, was introduced, consisting of correspondence between the Commissioner and the plaintiff company, reports of the company to the defendant, reports of examiners for the defendant of the plaintiff's affairs, and opinions of experts and actuaries who have made a study of the insurance business. It would be impracticable to here review and comment on all the evidence."

We think it would be impractical to do so in this opinion, not only on account of the great bulk of the evidence, but even more on account of its highly technical accounting and actuarial character. As to that phase of the matter, we find, in one of appellant's briefs, the following pertinent suggestion, or perhaps it should be called "admonition": "Judges may be eminently skilled in the law, but are not usually experts in the intricacies of insurance science." The respondents appear to be of the same opinion. It is said, in their brief:

"In view of the extremely complicated and technical questions of insurance actuarial practice, and the voluminous exhibits covering the entire history of the respondent's corporate existence, we doubt if *any* appellate court could possibly, even if it so desired, undertake to fully analyze all the evidence and exhibits to see if any error is con-

tained in the records. Surely no appellate court has ever undertaken such a monumental task, nor does any rule of law require that it be done."

While, in this appeal, we are primarily concerned with the affairs and operations of the Federal Old Line Life Insurance Company (Mutual), we are also concerned with an interrelated stock corporation known as Federal Association, Inc., commonly referred to as "the agency corporation," which was organized about the same time as the insurance company. The two corporations were interrelated from the first. In fact, the Federal Association, Inc., was organized to be the sponsor, and serve as the general agent, of the insurance company.

In an elaborate brochure called "The Decennial Report," widely distributed in 1947, the history of the two corporations, as well as their respective financial statements as of May 31, 1947, are shown in great detail. Several copies of this brochure are among the exhibits in the record. A copy was sent to every person holding a policy in the insurance company, and the document was otherwise widely distributed. The record shows that more than fifteen thousand copies were sent out in a single mail. While purporting to be a report of the insurance company, the brochure is, in fact, a history and report of both corporations. Under the caption "Federal Historical Notes," it is said:

"Form of Organization

"As a second step it was decided to organize the life insurance company under the mutual laws of the State of Washington and to organize a separate business corporation to act as general agent and to furnish a source of funds for the development of our agency system. The sponsoring company is known as the Federal Association, and is composed of about 2,500 Washington people many of whom are also policyowners in the Company."

Under the caption, "Additional Facts About Federal Association, Inc.," it is said, in note (8) on page 23 of the brochure:

"The Federal Association, Inc., was formed with a million shares of capital stock of an original par value of one cent. These shares were all subscribed and paid for by or-

ganization services and investments by the original founders and were then donated back to the Company, and shares were then given as a bonus with a security issued by the Federal Association, Inc., called an Income Note. There were approximately 2,500 Washington people who participated in this sponsoring Company of Federald Old Line Insurance Company, and the average investment was approximately $400. Income Notes provided 4% and 6% interest 'when, as and if earned,' and during the seven years from 1937 through 1943, this amount was paid regularly on the tenth of January. However, for 1944, 1945, and 1946 interest return was paid on the basis of 2% of gross premium volume, the last interest payment having been made this year on April 30, 1947. This change in mode of payment in interest came as result of revision in the method of calculating profits which greatly reduced the Company's liability for possible excess profit under the higher tax schedule adopted during the war. There have been no securities for sale by the Federal Association for over three years."

Several times during the trial, it was said, by Mr. J. R. Cissna, vice-president and chairman of the board of trustees of the insurance company and president of the agency corporation, that the affairs of the two corporations had been commingled. Since Mr. Cissna, in addition to being an insurance company executive, is also a member of the state bar, he was permitted to cross-examine certain of the defendant's expert witnesses. We quote briefly from his cross-examination of J. G. Bradley, who has been assistant actuary and examiner for the state insurance commissioner since prior to the time the Federal Old Line Life Insurance Company (Mutual) began business:

"Q. Now, this Federal Association—call it the agency company to eliminate the changes in names—the agency company and the life company have had their affairs commingled to a certain extent up until this last August, is that not true? Their affairs have been commingled, the Federal Association and Federal Old Line, as Mr. Williams said in his opening statement, were, in effect, one company so far as their officers were concerned? A. I would say yes. Q. The theory being that the investors in the Federal Association would sponsor the life insurance operation and receive back a percentage as compensation for

their investment and on risk taken; that was the relationship, was it not? A. Yes, by contracts between the two, that was the theory of the contract."

Mr. Cissna was eminently qualified to state that the affairs of the insurance company and the agency corporation were "commingled," and that they "were, in effect, one company so far as their officers were concerned." For he not only promoted both corporations, but, at the time of the trial of this case, was vice-president of the insurance company and chairman of its board of trustees, and had been so ever since its organization. Furthermore, he testified that, at the time of the trial, he was president of the Federal Association, Inc., and a member of its board of directors. He further testified that he owned about seven per cent of its stock, and that he owned a substantial amount of its interest-bearing notes. Mr. Cissna also testified that the president of the insurance company, George W. Jacobs, was a stockholder of the agency corporation, and at one time was a member of its board of directors. We take it that there must have been other persons who held important executive positions in both companies at the same time, since, as we have already stated, Mr. Cissna acknowledged, at the trial, that the Federal Association and Federal Old Line were, in effect, one company, "so far as their officers were concerned." In fact, Mr. Cissna directly testified that, during the first ten-year period, there were generally three or four men who occupied official positions in both companies. The commissioner's examiner's report of an examination of the insurance company made in July, 1941, lists the ten directors of the agency corporation, and points out that at that time all but two thereof were officers or trustees of the insurance company.

The Federal Association, Inc., as a general agent of the insurance company, carried on a very unique advertising campaign in selling Federal Old Line insurance policies. The evidence clearly shows that it was a very effective campaign, and also that it was a very expensive one. Among other things, it involved a lavish use of the principal radio stations throughout the state. It is shown, in the brochure

called "The Decennial Report," which we have hereinbefore referred to, that many thousands of songbooks were printed and distributed throughout the state. The principal one, called "Songs to Sing with Federal," contained the words and music of 5 college songs, of which "Vict'ry for Washington" is typical; 63 sentimental songs, of which "Drink to Me Only With Thine Eyes" is typical; 53 songs of all nations, of which the "Marseillaise Hymn" is typical; 22 songs of home, of which "My Old Kentucky Home" and "Home on the Range" are typical; 16 songs of the South, most of which are the well-known songs of Stephen C. Foster; 13 Western and mountain songs, of which "Whoopee Ti Yi Yo, Git Along, Little Dogies" is typical; 64 children's songs, of which Brahm's "Cradle Song" is typical; 58 hymns of all churches, of which "Onward, Christian Soldiers" is typical; 23 Christmas songs, of which "O, Little Town of Bethlehem" is typical; and 8 novelty songs, of which "Three Blind Mice" is typical. It is said, of the songbooks on page 16 of the brochure:

"The Songbook is brought out dozens of times a year in many homes, and in addition to 400 favorite songs it carries 41 separate articles and advertisements on the merits of Federal Old Line retirement, education, mortgage, business insurance, endowments, and life insurance plans."

Large numbers of a special songbook for children were also widely distributed, containing illustrated songs such as, "Mary Had a Little Lamb," "Twinkle, Twinkle Little Star," "Farmer in the Dell," and so forth.

It is further said, on page 17 of the brochure:

"At the outset, public acceptance of this Songbook idea had not been sufficiently established so that desirable radio time for the various programs on leading network stations could be secured. Today, in the State of Washington, one home in every five has a Federal Songbook. Leading stations throughout the State have allotted preferred time for these wholesome participation programs. In the Seattle area for example, in addition to leading independent stations, our featured children's program, 'The Pied Piper,' is heard on NBC's KOMO; KHQ, Spokane, 9:00 to 9:30, every Saturday morning. The 'College Songs' program is

heard at 4:00 on Saturday afternoons over ABC's KJR in Seattle. 'Let's All Sing with Max Dolin and the Federal Salon Orchestra' is heard on the CBS station KIRO at 9:30 to 10:00 Sunday evenings. Jackie Souders' Federal Marching Band, The Children's Chorus, Patricia Nordlund, Rusty Elder, the Singing Cowboy, and the Federal Chorus are heard transcribed over Mutual's KVI each Thursday at 8:00 p. m."

On pages 16 and 17 of the brochure are also reproduced photographs of the Federal Marching Band; the Federal Radio Theater located in the Federal Old Line Building at Seattle; also, the Federal Children's Chorus and its leader, David Pritchard; and the Federal Salon Orchestra and its leader, Max Dolin, and a woman vocalist who, we take it, served as a radio songleader.

We are unable to determine, from the record, the exact, or even the approximate, cost of these activities, but it is certain that it was very large, since it is shown that many of the songs were copyrighted and royalties had to be paid for their use. It is also clear that many well-qualified musicians were employed, and the amounts paid to the radio stations must have run into very high figures. Although, until about August, 1947, these activities were carried on by the agency corporation, a considerable amount of the costs during the prior years, in one way or another, were defrayed by the insurance company, and constituted a drain upon its funds.

The insurance company received from the insurance commissioner its certificate of authority to write insurance in the state of Washington in 1937. It appears from the record that the commissioner, through his examiners, kept close watch on the company's operations from the very beginning. He objected, from time to time, to many of its practices and to the interference by the agency corporation in its affairs, and also to its large expenditures. From the outset, the agency corporation was a general agent of the insurance company, and continued to be so through a series of contracts between the two companies. These contracts were frequently rewritten, and in some instances without

consultation with, or the approval of, the commissioner. There were about ten different contracts in existence, at one time or another, during the period of 1937-1947. Copies of most of these are in the record as exhibits. We will not attempt to outline them, although we will later give the principal terms of the contract now in force, which became effective shortly before the trial of these cases. When the insurance company was struggling through its early years, the agency corporation became indebted to it in progressively large amounts. This condition was created in two principal ways: (1) The insurance company made large advances to the agency corporation from time to time, and (2) the agency corporation frequently failed to promptly remit premiums which it had collected.

In so far as shown by the statutory, official annual reports of the insurance company to the commissioner, the amounts owing by the agency corporation to the insurance company were, from year to year, as follows:

| | |
|---|---|
| December 31, 1937 | $ 208.50 |
| December 31, 1938 | 260.94 |
| December 31, 1939 | (Not shown in annual report) |
| December 31, 1940 | (Not shown in annual report) |
| December 31, 1941 | $ 61,040.50 |
| December 31, 1942 | (Not shown in annual report) |
| December 31, 1943 | $ 81,566.61 |
| Plus accrued interest | 8,139.27 |
| Total | $ 89,705.88 |
| December 31, 1944 | $147,567.62 |
| December 31, 1945 | $199,209.11 |
| December 31, 1946 | $232,984.42 |
| Plus accrued interest | 21,292.17 |
| Total | $254,276.59 |
| And on May 31, 1947, as shown in the brochure | $222,905.67 |
| Plus accrued interest | 26,211.94 |
| Total | $249,117.61 |

Also, on August 21, 1947, as is shown in the existing contract between the two corporations, the indebtedness of the agency corporation to the company was, when the contract was approved by the insurance company on August

21; 1947, $222,905.67, plus accrued interest of $27,140.71, total, $250,046.38.

We need no further confirmation of the above figures, although they could be confirmed by use of the many reports of the commissioner's examiners which are among the exhibits of record. However, since the figures above shown are taken from the insurance company's own annual reports, it is unnecessary to resort to the examiners' reports to the state insurance commissioner. While this indebtedness of the agency corporation to the insurance company was increasing rapidly until it reached more than a quarter of a million dollars, the insurance company was showing increasing deficits. By deficits, as here used, we mean the shortage of its admitted assets as compared with its liabilities.

Exhibit No. 53, a chart or graph prepared by the commissioner's office, using data from the insurance company's annual reports and from the reports of the commissioner's examiners, shows the following:

On December 31, 1937, the company's admitted assets exceeded its liabilities by the sum of $1,204.55.

On September 30, 1938, its assets exceeded its liabilities by $850.45.

On December 31, 1938, its assets exceeded its liabilities by $2,299.41.

On May 31, 1939, its assets exceeded its liabilities by $2,520.75.

On December 31, 1939, its assets exceeded its liabilities by $5,714.92.

On June 30, 1940, its assets exceeded its liabilities by $5,811.24.

However, the commissioner, in a report made to him by his examiners as of September 5, 1941, found that, as of July 31, 1941, the company's liabilities exceeded its admitted assets by $29,069.59, and that at the same date the agency corporation was indebted to the insurance company in the amount of $47,564.63. The report further showed

that the insurance company had made the following advances to the Federal Association earlier in the year:

| | |
|---|---|
| May 2 | $1,800 |
| May 8 | 800 |
| May 29 | 2,820 |
| June 16 | 1,700 |
| Total | $7,120 |

At the close of the report, the examiners made the following suggestion to the commissioner:

"The report indicates that prompt action is necessary to either restore the life company to a solvent condition or to take whatever measures are given to you by statute, to repair the damage done by the improper investments of the insurance company's funds."

The commissioner acted promptly in the matter, and, on September 18, 1941, sent the insurance company the ninety-day notice provided for in Rem. Rev. Stat., § 7041, requiring it to make up a deficiency which the examiner found amounted to $30,786.80, as of September 15th. On September 19th, the commissioner notified the company that, during the ninety-day period, it would not be permitted to make further advances to the Federal Association. On December 17, 1941, the insurance company, through the affidavit of its secretary and trustees, certified that the deficiency of $30,786.30 had been more than made good by additional cash assets of $31,832.88. The commissioner's examiners at once verified that this had been done.

However, during this period, that is, during the fall of 1941, it became apparent to all concerned that the insurance company would have difficulty in showing a surplus of assets over liabilities, or even a balanced statement, as of December 31, 1941. As early as September 11, 1941, the officers and trustees of the insurance company formally requested the commissioner, by letter, that, in the event the $47,564.62 debit balance of the agency corporation, created by advances made to it by the insurance company and by the agency's failure to remit premiums collected by it, should not be allowed as an admitted asset, the commissioner would permit the insurance company to use so much

of the contingent liability of its policyholders as might be required to arrive at a bookkeeping balance between its assets and liabilities. The officers and trustees, in making the request, said:

"We, of course, would not expect, nor will we need such a ruling to be on the basis of an established policy or constitute a precedent, but only as a *temporary expedient* until the Federal Association has an opportunity to complete its scheduled program and repay the loan without interrupting the present operation which we consider fundamentally sound." (Italics ours.)

The commissioner had the statutory discretionary power to grant the request. Laws of 1937, chapter 42, § 15, p. 114, cited as Rem. Rev. Stat. (Sup.), § 7131-15, reads as follows:

"In ascertaining the condition of a mutual insurance company organized under section 7092 to section 7298, both inclusive, of Remington's Revised Statutes, or in any examination made by the commissioner, his deputy or examiner, he shall allow as assets only such investments, cash and accounts as are required of a stock insurance company transacting a similar class or classes of insurance business: *Provided,* That actual recoverable contingent liability of policyholders may, in the discretion of the commissioner, be allowed to the extent of the excess of liabilities over other assets."

The commissioner permitted the insurance company, as a "temporary expedient," to balance its December 31, 1941, annual statement by the use of $34,590.81 of the contingent liability of its policyholders; otherwise, the insurance company's annual statement, as of December 31, 1941, would have shown that its assets were less than its liabilities by that amount. By the permissive use of contingent liability, the insurance company was enabled to balance its statement as of December 31, 1941: "Liabilities, $87,906.53; admitted assets, $87,906.53."

The insurance company's annual statement as of December 31, 1942, showed a surplus of $52,404.79. However, more than $5,000 of this amount is questionable, for the reason that, in preparing the report, the agency corporation's debit balance, amounting to $5,487.59, that is, the

amount the agency corporation owed the life corporation, was used as an admitted asset. Another examination was made by the insurance department as of June 30, 1943. Although the agency's debit balance as of that date, $32,239.57, was not used as an admitted asset, as the similar item, although less in amount, had been used in the company's annual report of December 31, 1942, the examination showed a surplus of assets over liabilities amounting to $58,613.51.

During the next four months, this large surplus melted away, and was succeeded by a deficit. A departmental examination as of October 31, 1943, showed liabilities of $254,095.35, that is, a deficit amounting to $10,097.83. It also showed that, as of October 31, 1943, the indebtedness of the agency corporation to the insurance company, which, as of June 30, 1943, was $32,239.57, had increased in the four months of July, August, September, and October to $94,730.89 as of October 31, 1943. It is said, in the report of the October 31st examination, under the caption, "Comments on Financial Statement":

"The premiums paid by policyholders for the four months period ending October 31, 1943, amounted to $110,132.06 and commissions to the Federal Association on these premiums amounted to $51,434.72. Since the Federal Association deposited these premiums in its bank accounts, the net amount the Association should have paid the life company for these premiums was $58,697.34. The actual remittances made by the Association to the life company were July, 1943, none; August, 1943, $2,500.00; September, 1943, $5,000.00; and October, 1943, $7,500.00, or a total of $15,000.00."

We quote also from the testimony of Jerome G. Bradley, assistant actuary and examiner for the insurance commissioner, relative to the report of examination as of October 31, 1943:

"Q. Did your examination show what caused the decline in the company's affairs? A. Well, primarily it was an increase in the agent's debit balance. Q. Did that report show the amount of the agent's debit balance? A. Yes, it was $94,730.89. Q. That is as of the October report? A. Yes. Q. Again, Mr. Bradley, just as briefly, now, as you can, what

comprised this agency debit balance in this particular connection; that is, between the Federal Old Line Life Insurance Company and the Federal Association. A. It represented monies which had been advanced by the company to the association and monies which had been collected by the association reflected on the books of the company as having been paid for premiums but not yet delivered over to the company."

It is also said, in the report of examination as of October 31, 1943, under the caption, "Conclusion":

"During the four months period ending October 31, 1943, insurance in force increased from $10,223,908.00 to $11,-708,598.00 or an increase of $1,484,690.00. During the same period surplus decreased from $58,613.51 to a deficit of $10,097.83 or a total decrease of $68,711.34. Thus $68,711.34 in company assets were used and insurance in force increased $1,484,690.00. This investment of surplus is about $46.00 per thousand of insurance gained or more than 200% of the average premium.

"It is a recognized fact that new and small insurance companies must invest some surplus in the acquisition of new business. There is a limit, however, to the amount of surplus that may be so invested under a good management. In fact so much can be spent for new insurance that the business never will be profitable to the company, regardless of how long it stays in force.

"The current decrease in surplus was not spent by the Federal Old Line Life Insurance Company but arose through advances, direct and indirect, to the Federal Association, Inc. The activities of the Association are diverse and far-flung. These have included the purchase of a small industrial company in Texas and the establishment of agencies in California to represent a Michigan insurance company. Such ventures have represented considerable investment and some losses. An examination of the life company does not disclose whether the Association has spent these life company funds solely for the benefit of the policyholders or whether the funds have been used in establishing or extending the other activities of the Association. Since an agent is a servant of the principal and, therefore, subject to replacement, it cannot be said that the purchase of an insurance company, foreign agency activities, real estate operations, publishing of a magazine or the payment of

interest on the Association's obligations redound to the benefit of the life company policyholders.

"On June 30, 1943, policyholders representing $10,223,-908.00 of insurance possessed good and acceptable assets which amounted to 140% of the statutory reserve requirements. On October 31, 1943, policyholders representing $11,708,598.00 of insurance possessed good and acceptable assets amounting to only 94% of the statutory reserve requirements."

The insurance company's annual statement for the year 1943 showed an excess of assets over liabilities of $29,-132.78, as of December 31, 1943. Since, as we have hitherto noted, there was a deficit of $10,097.83 on October 31, 1943, it is apparent that this deficit was cured and a surplus of more than $29,000 created in November and December, 1943. Upon being asked how this was accomplished, Mr. Bradley, the department's assistant actuary and examiner, testified as follows:

"A. The major portion of it was represented by the association giving the home office building to the life company in order to write off part of the agency debit balance that previously existed."

In April, 1944, the insurance department conducted another examination, primarily to check and verify the company's annual statement for the year 1943, and to determine whether the deficit shown in the department's report of the financial condition of the company, as of October 31, 1943, had, in fact, been made good. As above stated, the company's annual report for 1943 showed a surplus of $29,-132.78. The departmental examination of April, 1944, corrected this amount to $24,372.66, for reasons specifically set out in the report (Exhibit No. 22). In this examination, the examiners also made a thorough examination of the financial status of the agency corporation, and thoroughly discussed the then existing contract between the two companies. Unfortunately, this portion of the report is too long to permit of quotation. We say unfortunately, because it tends, more than any other evidence or exhibit in the record, to throw light on a major issue in this controversy,

to wit, whether or not the tie-up between the two companies creates such condition as would tend to render the future operation of the insurance company hazardous to its policyholders and the public.

The report of the April, 1944, examination also shows that the agency's debit balance, that is, the amount it owed to the insurance company, increased by more than $76,000 during the year 1943. We have verified this statement from the insurance company's own annual statements. The insurance company's statement as of December 31, 1942, shows that on that date the agency owed the insurance company $5,487.59. The insurance company's statement as of December 31, 1943, shows that the agency corporation on that date owed the insurance company $81,566.61, an increase of the agency's indebtedness during the calendar year 1943 of $76,079.02. The report of the April, 1944, examination also foreshadowed a greatly enlarged debit balance as of December 31, 1944, since it showed that the debit balance, which was $81,566.61 on December, 1943, increased during January, 1944, to $90,422.35, and, by February 29th, had grown to $94,563.79. We find, on consulting the insurance company's own annual statement covering the year 1944, that, by December 31, 1944, the agency's debit balance had grown to $147,567.62. According to the report of a later examination by the departmental examiners, the true amount of the debit balance, as of that date, was $221,-742.83. (Exhibit No. 24, p. 22.)

Another examination was made by the commissioner's examiners as of December 31, 1944. The examiners reported that a resolution was adopted by the directors of the insurance company on September 22, 1943, designed to prevent the future increase of the agency corporation's debit balance by requiring the agency corporation in the future to remit one hundred per cent of all premiums collected by it, and by further providing that no more advances should be made to it by the insurance company. After quoting this resolution, it is said, on page 8 of the examiner's report (Exhibit No. 24):

"Since this resolution was passed, the officers of the Federal Old Line Life Insurance Company have not transacted business with their agency company according to instruction contained in this resolution. There is no evidence that a demand has been made by the company upon their agent to enforce the above resolution."

It is further said, on page 30 of the report:

"The officers of the company have not complied with the resolution adopted October 21, 1943, wherein the Federal Association, Inc., was to pay to the Federal Old Line Life Insurance Company the total premiums received and the further resolution adopted December 15, 1943 as quoted under the caption 'Corporate Records.'

"The system as used by the Association and the life company with regards to the accounting of funds is unusual for insurance accounting and does not lend itself readily to audit.

"Funds belonging to the life company held in the Association branch offices should be remitted promptly and directly to the life insurance company.

"Credit given by the life company to the Association on their balance in the amount of $21,322.59, although authorized by board action, is questioned. Your examiners have disallowed this transaction as it appears contrary to Section 86-13 of the Insurance Code."

The insurance company was greatly displeased with the report and criticized it severely in an extensive written protest to the commissioner, which intimated that the report was the result of a biased examination. The commissioner, while not admitting this charge, thought it proper and desirable to call in an outside expert to make a survey of the affairs of the Federal Old Line Life Insurance Company (Mutual) and the Federal Association, Inc. He requested a New York actuarial company, Joseph Froggatt & Company, Inc., to furnish the department a man well qualified for that purpose. It sent Mr. Earl Nicholson, who at that time had been its Chief Actuary for nine and one-half years and who had previously done actuarial work for various insurance companies after receiving a Master of Arts degree in actuarial science from the University of Michigan in 1925.

Mr. Nicholson spent a considerable portion of the summer of 1945 in the offices of the two companies. In his report, Mr. Nicholson included a statement of the assets and liabilities of the insurance company as of June 30, 1945. It showed liabilities amounting to $533,351.28, and admitted assets of $443,201.23, that is to say, a deficit of $90,150.05. It also showed that the agency's debit balance had increased to $222,329.19, plus accrued interest, $4,939.00, total $227,268.19. Nicholson was present at the consolidated trial of the two actions and testified at length. We think a few quotations from his testimony will be more useful than an attempted analysis of his long and technical report:

"Q. Will you tell us the basis upon which you were to go into the affairs of this company, that is, the purpose and the scope of your examination? A. When I came out here the Commissioner of Insurance, William A. Sullivan, told me that the object of employing me was to determine whether or not there was any basis which would justify his giving consideration to the request of the company for the contingent liability and whether there was any basis under which the company could continue to operate within its resources. Q. Did that encompass the scope of your work so far as this insurance company is concerned? A. Not entirely. The scope of the work also involved making an examination as to the current standing of the company and certain matters regarding their control and operating procedures. Q. Then you did go into the affairs of the company and make such an examination as has been testified to this morning? A. I did. . . . Q. . . . May I ask you to state briefly what were your findings so far as this company was concerned? A. Regarding the examination, the findings were that there was an excess of liabilities over assets in the amount of $90,150 and some over that. In my opinion there was a basis under which the company could operate within its resources. Q. Prior to this time was there an indication that the company had ever operated within its resources? A. I didn't go into the prior operation. Q. And at that time was it operating within its resources? A. It was not. Q. Upon what basis did you suggest that it could operate within its resources? A. The basis under which it could operate within its resources would be on the basis of current operating statements which

would show that its operation was within its resources. Q. Did you make any suggestion as to budgeting expense? A. The suggestion regarding budgeting expense was a comparison of income to outgo, and in the plans which we had regarding that it was always emphasized that the only basis under which it would be possible to have such a statement would be the comparison; not that there would be specific amounts that could be relied upon, but as fixed requirements of volume. Q. Handing you what has been marked Defendant's Exhibit 54, what is that? A. This is the book of Joseph B. MacLean on Life Insurance. Q. What edition? A. 1939. Q. Is that a standard work? A. It is. Q. This is an earlier edition than the one that was just previously admitted in evidence here? A. That is right. Q. Mr. MacLean, in this work, states that the admitted assets are the assets which—this is on page 318—that the admitted are the assets which one must compare with the liabilities in order to determine the solvency of the company and the amount of its surplus. Is that a correct definition? A. It is. Q. In your judgment? A. It is. Q. Is it an accepted one? A. It is. . . . Q. Has that definition undergone any change within the meaning of men who are versed in actuarial science? A. No. Q. In the past six years? A. No, and it is the legal meaning. The annual statement blank is a part of the law in every state. Q. It is only the admitted assets that can be compared with the liabilities to determine solvency, is that correct? A. That is right. Q. Mr. Nicholson, you are familiar with the contingent liability lien under the Washington State law? A. I am. Q. To some extent? A. Yes. Q. In your opinion, does the contingent liability lien under the Washington statute compare with what is known in insurance circles as the automatic premium loan? A. It does not. Q. You say it does not? A. That is right. . . .

"Q. Did you make any recommendation as to what would have to be done by this company as of the time of your examination, in order to stay within its income? A. I did. Q. What were your recommendations on that? A. The recommendation which was made by me in conjunction with the Insurance Commissioner after the usual discussion of the matter was that he would be justified in giving consideration to the company's request if it was shown by monthly statements which he received currently that the company's operations were kept within its resources, and, moreover, that the amount of the deficit of $90,150 did not

increase. It was felt, moreover, and it was my recommendation that in order to secure the performance of that operation there should be an executive committee which would have control of all operations of the company composed of Mr. Cissna and other members who had no financial interest in the company, and in that way there would be an operation which would be attested, in which there would be a diversity of opinion. It would not just be a matter of a similar opinion. Is that the answer you called for? Q. I think so. . . . Q. In your opinion, Mr. Nicholson, based on what you had found about the condition and affairs of this company as of June 30, 1945, would you say that the answer to their financial problems was the procuring of new business alone? A. No, I would say the answer to their financial problems was that the primary problem involved was living within their resources. Q. In what way, living within their resources; what do you mean by that? A. That the deficit don't increase and that they were able to pay their expenses and set up their reserves out of the income received. Q. Based upon your examination into the affairs of this company and the statement of its condition as of June 30, 1946, as has been testified to here and shown by the exhibits, would you say that this company has improved its prospects of eventual solvency over what the condition was when you examined into it in 1945? A. I would not."

Mr. Nicholson also surveyed the operations of the agency corporation, and, in his report, said, among other things:

"Inasmuch as the income of the Federal Association, Inc., is limited to its income from the Federal Old Line Life Insurance Company (Mutual) with minor exceptions, it is essential that the expenses of the Federal Association, Inc., shall be in line with its income. Otherwise, the excess results in an increase of the balance due the Federal Old Line Life Insurance Company (Mutual) by the Federal Association, Inc."

He further found the agency corporation's operating statements showed expenditures considerably in excess of income, and made specific recommendations to the insurance company regarding limitation of its expenses, which will not be detailed in this opinion.

After a study of the Nicholson report, the commissioner requested the insurance company to furnish him with

monthly financial statements and operating figures showing its operations, as related to budgetary estimates which Nicholson had recommended as advisable. For nearly a year (August 31, 1945, to June 30, 1946), the insurance company furnished such statements.

The insurance company's annual statement as of December 31, 1945, showed a balance between assets and liabilities, but this was only possible because the insurance commissioner, in the exercise of his statutory discretion, permitted it to use $45,951.67 of the contingent liability of its policyholders. As of December 31, 1945, as the company's annual report for 1945 shows, the agency's debit balance was $199,209.11.

On April 7, 1947, Jerome G. Bradley, assistant actuary and examiner for the insurance commissioner, furnished the commissioner with a report of an examination of the insurance company covering the period from June 30, 1945, to November 30, 1946, and a statement of its assets and liabilities as of November 30, 1946. This report showed an excess of liabilities over admitted assets amounting to $187,730.79. It further showed that the agency's debit balance, as of that date, was $232,161.13, an increase over the amount shown in the company's annual report, as of December 31, 1945, of $32,952.02.

While the examiners were making the examination just mentioned, the insurance company filed its annual statement for 1946. It showed a balance of assets and liabilities by treating $214,812.56 of the policyholders' contingent liability as an admitted asset. As we have hitherto stated, the commissioner, at several times, permitted the company to resort to its policyholders' contingent liability, in order to arrive at a balance. This was done in 1941, upon the representation of the company that it would not expect such a permission to establish a policy or constitute a precedent, but only "a temporary expedient." As we understand the record, the company made use of $214,812.56 of the contingent liability of its policyholders in its annual statement for 1946, without requesting the commissioner to permit it to do so. Since the company's use of this

$214,812.56 of contingent liability resulted in a balanced statement between assets and liabilities, it is, of course, perfectly plain that, if it had not done so, there would have been a deficiency of $214,812.56 as of December 31, 1946. At that time, as the company's annual statement for 1946 shows, the agency corporation was indebted to the insurance company in the principal amount of $232,984.42, plus accrued interest of $21,292.19, total, $254,276.61.

Plaintiffs contended at the trial, and on this appeal contend, that that amount was secured and collectible, and, therefore, could have as rightfully been used as admitted assets as if it were cash. If that indebtedness was so easily and surely collectible as to be properly regarded as cash in hand, it seems strange that the insurance company did not collect it, or at least make some effort to do so. If it had collected that indebtedness, or even a sizeable percentage thereof, it would have had actual cash on hand, not merely sufficient to balance its statement as between assets and liabilities, but to show a surplus of assets over liabilities of many thousands of dollars, without resorting to the contingent liability of its policyholders.

The final decision in this appeal must largely turn on whether or not, in determining the financial condition of the insurance company at various times, and particularly in 1947, the contingent liability of its policyholders could legally be used as an admitted asset. As we have hitherto noted, the commissioner, at the company's request, permitted its use as a balancing item on several occasions. We have earlier in this opinion quoted the statute which authorized him to do so. Laws of 1937, chapter 42, § 15, p. 114; Rem. Rev. Stat. (Sup.), § 7131-15. In 1941, as hereinbefore shown, the commissioner permitted its use, upon the assurance of the trustees of the insurance company that they would not regard such action as "a precedent" or as establishing "a policy," but merely as "a temporary expedient."

The present controversy arose out of the company's use of contingent liability of its policyholders, without permission of the commissioner, in making its annual statement

for 1946. That statement was delivered to the commissioner on March 3, 1947. It showed liabilities of $999,852.54, and admitted assets of $999,852.54; that is, a balanced statement. But to do so, the company used $214,812.56 of contingent liability of its policyholders as admitted assets, thereby swelling the admitted assets by that amount. Without that use, which was not authorized by the commissioner, the company's admitted assets would obviously have been $214,812.56 less than its liabilities; that is, the report would have shown a deficit of assets as compared with liabilities of $214,812.56. After a study of the report, the commissioner came to the conclusion that the company's actual assets, as of December 31, 1946, were, in fact, $214,812.56 less than its liabilities.

Rem. Rev. Stat., § 7041, Laws of 1911, chapter 49, § 10, p. 169, provides, in substance, that, whenever it appears to the commissioner, from any statement or showing made to him or from an examination made by him, his deputy, or examiner, that the assets and resources of any mutual company are insufficient to justify its continuance in business, he shall promptly determine the amount of such deficit and thereupon issue his written notice and requisition to the trustees, directors, and officers of such company requiring them to make good the amount of such deficit within ninety days of the service of such notice and requisition; and upon the service of such notice and requisition, the trustees, directors, and officers of such company shall forthwith cause such deficiency to be made good, and proof to be filed in the office of the commissioner within the time specified in the notice and requisition that the same has been made good.

On a former occasion, the commissioner had demanded that a much smaller deficit be made good, and it was made good. As hereinbefore shown, the commissioner, in obedience to the statutory directive, required the insurance company, on September 18, 1941, to make good a deficit of $30,786.80, found to exist as of September 15, 1941; whereupon the insurance company filed proof on December 17,

1941, that the deficit had been made good by acquiring additional cash assets of $31,832.88.

On April 30, 1947, the commissioner notified the insurance company, in writing, that he would no longer approve the use of contingent liability of the policyholders as admitted assets, as had formerly been allowed as a temporary expedient only, and that he felt that the continued allowance of contingent liability as admitted assets might be interpreted as a sanction of the unrestricted use of contingent liability as assets.

As heretofore pointed out, without the allowance of the use of $214,812.56 of contingent liability as an asset in the December 31, 1946, statement, that statement showed a deficit of assets as compared with liabilities, that is, a deficit of $214,812.56. In the notice, as required by the statute, the commissioner required the company to make good that deficit within ninety days. The impact of this notice on the company is both interesting and significant. It can be best shown by short quotations from the testimony of Mr. Cissna, who, since he dominated its affairs, can quite properly be regarded as the company:

"Q. I hand you Plaintiff's Exhibit 'F' for identification. A. This is a letter from the office of the Insurance Commissioner, dated April 30, 1947, signed by William A. Sullivan, Insurance Commissioner, in which notice is given that the liabilities exceed the assets of the company. Q. Was that received by you? A. That was received by me. . . . Q. You received that notice on April 30th, or shortly thereafter? A. Right around the first of May, yes. Q. Was that the first notice you had had that the Commissioner was not intending to allow a contingent liability? A. Well, yes, that was some $700,000 that could have been allowed in his discretion, but the required amount was something over 200,000 and we felt the report was the best report we had ever received and we felt it wasn't justified and were surprised to receive the report and notice. Q. What, if anything, did you proceed to do toward making up the deficiency claimed by the Commissioner, what steps did you take? A. We discussed the alternatives, one of which was bringing an action against the Commissioner for arbitrary action in not allowing the contingent liability inasmuch as

there was actual cash behind the contingent liability in an amount, in excess of the amount required to balance the tabular reserves. . . .

"Q. Just tell us what you did. A. After considering that alternative, *we decided that inasmuch as it wouldn't call for any payment of an additional cent by any policy holder*, that we would reduce the contingent liability to an actual liability, and by asserting this lien, most of which funds wouldn't be available to the policy holders in any event, so the resolution was adopted pursuant to a by-law of the company providing for the reduction of this contingent premium to an actual liability and thereby extinguishing the contingent premium and providing the reserves called for by the Code." (Italics ours.)

It would seem that Mr. Cissna and his associates might very well have considered still another alternative, that is, the collection of the amount due the insurance company from the Federal Association, Inc., which at that time, according to the company's own records, amounted to $222,905.67.

As stated by Mr. Cissna, the officers and trustees of the insurance company decided that they would comply with the April 30th requirement of the commissioner that they make good the company's deficiency of $214,812.56 by resorting to the contingent liability of its policyholders, and it is shown, by that portion of the paragraph which we have italicized, that they adopted that alternative, "inasmuch as it wouldn't call for any payment of an additional cent by any policyholder." Obviously, what the company needed, to comply with the commissioner's requisition, was actual cash, over and above that accruing from the current annual premiums of the policyholders; and it is somewhat difficult to understand how an additional $214,812.56 could be gotten from the policyholders without calling for the payment of an additional cent by any policyholder. However, the company claimed that it did so through the assertion of liens upon the reserves of those of its policyholders who had reserves exceeding the amount of one annual premium, and that it thus complied with the commissioner's demand and arrived at a state of solvency. The

trial court so held. We do not agree with that holding. In fact, we are of the opinion that, before the end of the same month in which the liens were asserted, the deficiency increased to the sum of $322,186.60.

Shortly before the expiration period of the ninety-day notice, the officers and trustees of the insurance company made and filed with the commissioner a purported proof of compliance with his requisition of April 30, 1947. It was stated, in substance, that they had secured the services of two Chicago actuaries, Harry S. Tressel and Morris Wolfman, who came to Seattle and personally and at length surveyed the company's financial condition. A copy of their report to the company was enclosed, which included a detailed financial statement as of May 31, 1947. Enclosed with the so-called proof of compliance were also six copies of the brochure called "The Decennial Report," each of which showed the financial statement as of May 31st, and also the proceedings by which the company had sought to improve its financial condition by resorting to the contingent liability of its policyholders.

In order to explain why we think the assertion of the liens, in connection with the contingent liability of the policyholders, did not cure the insolvency of the insurance company, it will be necessary, first, to resort to certain statutes and to the exact measures which the company took in asserting the liens. Rem. Rev. Stat., § 7132, provided, in part, as follows:

"Said by-laws shall provide for the liability of its members or policy-holders for the payment of its losses and expenses, which liability, including the amount of the premium, shall not be less than two times the amount of the premium nor more than six times the amount of the premium charged by solvent stock companies for like risks and terms. The by-laws shall limit the expenses to not more than forty per centum of the net premiums charged and collected for insurance, which expense must include all sums paid by the insured for his insurance including any membership, policy, survey, or inspection fee, or other fee or charge, if any: Provided, however, that 'expense' in the

case of mutual accident and health companies shall not be construed to cover costs of adjusting or defending claims. [L. '19, p. 725, § 1; L. '11, p. 231, § 87.]"

Laws of 1931, chapter 142, p. 437, § 1, Rem. Rev. Stat., § 7130, which controlled the organization of insurance companies at the time the Federal Old Line Life Insurance Company (Mutual) was organized, provided, in part, that it should state, in its articles:

" . . . if it be a mutual company, the minimum and maximum liability of its members or policyholders for the payment of losses occurring under its policies, which liability shall be not less than two nor more than six times the amount of the premium usually charged by solvent stock insurance companies for insuring like or similar risks for the same term, . . ."

The above statutes are reflected in Article IV of the Articles of Incorporation of Federal Old Line Life Insurance Company (Mutual). Article IV reads as follows:

"The amount of liability of each of the owners of life insurance policies in this company, including waiver of premium, disability and double indemnity benefits, for the payment of losses and expenses of the company shall be only one times the amount of the annual premium on said policy, in addition to the amount of said premium that is regularly paid according to the terms of the policy. The owners of accident and health insurance policies in this company shall be liable for such losses and expenses of the company in an amount equal to five times the premium on said policy in addition to the amount of said premium."

All of the company's policies contain the following:

"Contingent Premium and Liability Limit. As fixed by the By-Laws of this Company, it is expressly provided that the contingent liability of the Policy owner shall not exceed one additional annual premium as noted in the Policy."

On April 24, 1947, the following amendment to the insurance company's by-laws had been duly and regularly adopted:

"ARTICLE VII—Contingent Premium and Liability Limit

"(1) It is expressly provided that the contingent liability of the policyowner shall not exceed one additional annual premium as noted in the policy.

"(2) Whenever the Board of Trustees shall determine that there exists a situation where the reserves and liabilities exceed admitted assets or where the company is notified that it is required to provide additional assets so its admitted assets will equal or exceed reserves and liabilities, then a resolution is to be adopted by the Board authorizing the reduction of the contingent liability of policyowners to possession as hereinafter provided.

"(3) The charge for the additional premium shall be made by resolution of the Board of Trustees and shall be effective as of the date fixed in the resolution. Notice of the resolution or a copy thereof shall be given the policyowners within 90 days after its passage.

"(4) When such action. is required the charge shall be for the actual definite amount of one annual premium and not more or a fraction thereof. The charge shall apply equitably to all policyowners of record alike on a specified date, and shall be in the nature of indebtedness drawing interest and may be known as a special automatic policy loan. It may be liquidated if desired by the policyowner, but is not a part of the regular premium to be billed for upon which a commission is payable.

"(5) The Board of Trustees shall have power to waive collection of the special automatic premium loan or a part thereof for definite periods, or by proper dividend action so that all death claims or maturities may be paid promptly and in full.

"(6) In the declaration of any dividends the Board of Trustees may first apply dividends to the credit of those policies to the extent of the charge which may have been made and may add an amount that will represent reasonable compensation for this added security to the company on such a basis as will be equitable to all policyowners, if in the discretion of the Board of Trustees it is to the best interests of the company."

It does not seem probable that many of the liens, if any, attempted to be asserted by the the foregoing amendment, will be discharged in the manner provided by the final paragraph of the amendment, that is, by the application of dividends. All policies issued by the insurance company are participating policies, and contain the following provision:

"The Company will, beginning not later than the fifth anniversary of this Policy, and on each anniversary there-

after (if this Policy is then in full force and effect), declare such dividend as shall have been apportioned by the Company to this Policy. Such dividend shall, at the option of the Insured, be either:  . . ."

There can be no doubt but that many thousands of policies issued during the early years of the company's operations, have reached, and passed, their fifth anniversaries, and it is admitted that the insurance company has never declared, or paid, any dividends. Furthermore, we can find nothing in the record which makes it seem probable that any dividend will be declared and paid, or can be declared and paid, in the foreseeable future. On the other hand, there is considerable evidence which seems to make such action quite unlikely, and, perhaps, altogether impossible.

On May 5, 1947, the board of trustees of the company adopted the following resolution, which we quote from the brochure which we have hitherto spoken of as "The Decennial Report":

"RESOLVED: That pursuant to Article VII, the Board of Trustees hereby instruct the officers to notify all policyowners of record as of May 31, 1947, and those entitled to reinstatement as of that date, that the contingent additional premium stated in their policies is hereby asserted and is hereby reduced from a contingent to an actual obligation. Such additional premium shall be considered a charge against each policy to bear interest at the valuation rate specified in the policy.

"That while no demand for the additional premium will be made in cash, nor will the policy lapse in the event of failure to make such payment, if all regular premiums are paid when due or within the grace period, a policyowner may make such additional payment in cash and he will receive due credit therefor.

"That the assertion of this charge and fixing of this obligation extinguishes the *contingent* premium liability of the policyowner as such.

"That all policyowners shall be advised that action has been taken by the Board of Trustees for the current year and it is our intention to adopt from year to year such appropriate action as may be necessary to pay any and all death claims and maturities in full, and in accordance with the terms of the policies. *The policyowners shall be fur-*

*ther advised that the only present effect of the action herein taken is to make this additional premium deductible from non-forfeiture values in the hands of the company in the event a policyowner fails to continue regular premium payments as called for under the terms of the policy or in borrowing on said policy.*

"That the officers are hereby directed to include this resolution together with a full copy of the By-Law heretofore referred to in the Decennial Report to Policyowners together with such further information relative to this action as the officers may deem proper and that mailing the Decennial Report containing this notice and By-Law to the addresses of the policyowners last shown on the books of said company shall constitute due notice required by the said By-Law.

"That included in the Decennial Report hereinafter referred to shall be a balance sheet of the company as of May 31, 1947, setting forth the condition of the company indicating the effect of this resolution."

The words we have italicized in the above quotation are printed in heavy, black-faced type in "The Decennial Report."

We now turn to the financial statement of the insurance company as of May 31, 1947, as prepared by Mr. Tressel and his associate and sent out in the brochure to every policyholder. In the list of gross assets is an item called "Special Automatic Premium Loans," $822,246.06. At the trial, the attorney who made the opening statement for the plaintiffs offered a copy of "The Decennial Report" as Exhibit "A," called the attention of the trial judge to the fact that he had ink-checked the $822,246.06, and added, with great candor and with perfect truth, "It is called here 'Special Automatic Premium Loans.' However, *it is not what it is called,* that is the truth of the matter; . . ." (Italics ours.) He could have just as appropriately added that it bore no substantial resemblance to an automatic premium loan.

It probably was so labelled in the financial statement because, in amending the by-laws on April 24, 1947, purporting to authorize "the reduction of the contingent liability of policyowners to possession," by asserting liens

against the reserves of those policyholders who had reserves exceeding the amount of one annual premium, the trustees, for some reason, said: "The nature of the indebtedness may be known as a special automatic policy loan." If it is an automatic policy loan at all, it must indeed be a *special* one. The true and familiar automatic policy loan is clearly described and explained in the policies issued by the company. It would seem that the special name was invented to give color to an attempt to use the $822,246.06 amount as an admitted asset. Indeed, it was at first so used, but, in the final computation, only $428,438.41 of it was actually so used.

In giving evidence, Mr. Tressel explained that the $822,-246.06 figure was, in fact, the gross amount of one annual premium on all policies in force. Of that amount, $393,807 was not secured by policy reserves, but $428,438.41 of the $822,246.06 was, and that amount was used in the computation as an admitted asset. Mr. Tressel, while under cross-examination, made certain computations on a blackboard:

"Q. The net result is $322,186.60 is it not? A. Yes. Q. Does that represent the amount of the deficiency which this levy attempted to procure or purported to procure? A. That represents the amount of contingent liability, contingent assets which it was necessary to reduce to possession to make the company solvent. Q. In other words, that represents the amount of the contingent liability asset which is necessary to balance the company's statement? A. Yes."

■ Counsel for respondents, throughout the trial, repeatedly and persistently contended that a comparison between assets and liabilities is not a true test of insolvency. Earlier in this opinion, we have quoted expert evidence to the contrary. Mr. Tressel was respondents' chief witness, an undoubtedly well-qualified one; also, a candid witness. The commissioner was contending that, as of May 31, 1947, the insurance company was insolvent by $322,186.60, a figure which he reached by subtracting the admitted assets from the liabilities. However, as just above quoted, Mr. Tressel testified that $322,186.60 represented the amount

of contingent assets "which it was necessary to reduce to possession to make the company solvent." It seems clear to us that, in so doing, he admitted at least three things: (1) That the company was not solvent; (2) that the test of solvency is a comparison of assets with liabilities; and (3) that, if the use of $428,438.41 of the $822,246.06 as an admitted asset was not justified, the insurance company, as of May 31, 1947, was insolvent to the amount of $322,186.60.

However, we have no doubt but that Mr. Tressel would strongly contend that the $428,438.41 is legally an admitted asset. It was his contention, and Mr. Cissna's and other counsel's who appeared for the respondents, that the whole $822,246.06, which, as explained by Mr. Tressel, was the amount found by multiplying one annual premium by the number of policies in force, should have been used as an admitted asset. Had that been done, the computation would have arrived at a very large surplus. Nowhere in the statement of facts, nor in the respondents' brief, have we found a logical argument in support of the theory that there was never any deficit. We are inclined to think that it is based upon some language found in Rem. Rev. Stat., § 7033, Laws of 1927, § 1, p. 200, reading as follows:

" 'Net assets' means the property and funds of an insurance company available for the payment of its obligations; including uncollected premiums not more than three months past due on policies actually in force, and including in the case of a mutual company, its premiums, premium notes, and *contingent liability of its policy holders,* after deducting from such funds all unpaid losses and claims and all other debts and liabilities except capital."

Note the words we have italicized which seem to recognize contingent liability as an asset.

Throughout the trial, respondents' attorneys, and some of their witnesses, kept reiterating that, when the insurance company was organized, the law permitted the full use of contingent liability as admitted assets. They did not point out what law. We suppose, however, it was that portion of Rem. Rev. Stat., § 7033, which we italicized in quoting it a few lines back. But, if so, it has been super-

seded by Rem. Rev. Stat. (Sup.), § 7131-15, Laws of 1937, chapter 42, § 15, p. 114, putting that matter in the discretion of the commissioner. As to that matter, Mr. Cissna stated that this change in the law was in violation of the principles laid down in the *Dartmouth College* case.

From time to time, the respondents insisted that, without question, contingent liability would be recognized as an asset under the new insurance code of 1947, which went into effect on October 1, 1947, a few days before the trial court rendered its oral opinion in this case and in which it seemed to give some credit to that position. The laws in force during the ten-year period, 1937 to October 1, 1947, are the laws which control in this case, and not laws repealed prior to 1937, or laws which went into effect on October 1, 1947.

Mr. Tressel repeatedly stated that, by the amendment of the by-laws of April 24th and the resolution of May 5, 1947, $428,438.41 of the contingent liability had been reduced to the possession of the insurance company. We cannot follow this. It is admitted that the company got no ready money or actual cash. What, then, did it reduce to possession? At the most, it got a number of liens on some policy reserves. A lien, of course, is merely a security. Liens so asserted may assist the company to reduce to possession some actual assets as of some future time, but, obviously, never as of May 31, 1947.

If the reader will turn back to the long quotation of the by-law of April 24, 1947, and the resolution of May 5, 1947, and re-read them, he cannot help but note that the by-law says that the additional premium may be liquidated, "if desired," by the policyholder, but is not a part of the regular premium to be billed for. It will also be noted that it is said, in the resolution of May 5th, that no demand for additional premiums will be made in cash, but a policyholder *may make* such additional payment in cash and he will receive due credit therefor. This is quite in line with Mr. Cissna's testimony, hereinbefore quoted, that the assertion of liens for contingent liability "wouldn't call for any payment of an additional cent by any policyholder."

It is certain that the assertion of the lien produced no current, tangible asset, and no one can, with any certainty, tell when it will produce cash assets or estimate the amount thereof.

Mr. Tressel testified that holders of term insurance have no obligation to pay the extra premium charge; that the additional premium is collectible only in the event of lapse, surrender, or borrowing against the policy; and further, if the policy has no cash value, or has lapsed or been surrendered, the additional premium is not at all collectible; also, that the assessment is not collectible from the proceeds of a matured policy, nor from benefits payable on death. The number of policyholders who may surrender or borrow on their policies is wholly undeterminable, since there is, of course, no obligation upon any policyholder to surrender or borrow. No one can reasonably predict how much of the $428,438.41, used as admitted assets in the financial statement as of May 31, 1947, will ever be collected. Certainly, no part of it had gotten into the possession of the insurance company as of that date.

Furthermore, the commissioner was advised by the attorney general that the assertion of the lien was probably void. We have considered the attorney general's reasons for the opinion and consulted the authorities cited in its support. We are inclined to agree with the attorney general's opinion that the assertion of the lien was probably void, and for other reasons urged and discussed in the appellant's brief. We are unable to determine, from the record before us, just what the insurance company's financial condition was on September 4, 1947; neither are we able to determine its financial condition as of December 31, 1947. We do not have the company's annual statements for 1947 and 1948.

A new agency contract was entered into between the two companies in August, 1947, retroactive to July, 1947. We will outline it only briefly. By its terms, the insurance company is given the right, in the state of Washington, to use the plan of sales created by the agency corporation, and used by it for some years. Furthermore, the agency

corporation turned over to the insurance company a large amount of furniture and fixtures, together with advertising equipment, films, projectors, and so forth, the effect of which transfer was to wipe out the agency's debit balance, which it is said, in the contract, to have been, as of July, 1947, $222,905.67, with interest in the sum of $27,140.71. The insurance company received, in this transaction, a vast amount of material which the agency corporation had used in its advertising campaign, described early in this opinion, such as films, projectors, and so forth, and other material used in its radio advertising campaigns. Paragraphs 3, 4 and 7 of the contract adopt steps which the commissioner's examiners had urged upon the company for many years and which were also recommended by Mr. Nicholson and by Mr. Tressel and his associate, Mr. Wolfman. Those paragraphs read as follows:

"(3) The foregoing assignment, transfer, and sale contained in paragraph two shall apply and include the transfer of ownership of material including projectors, film, etc., that are prepared for use in securing business for the Insurance Company, except copyrights, patent rights or rights to copyrights or patents.

"(4) That on the following July 1, 1947, or as soon thereafter as practicable, and at all times thereafter, commingling of expenses for the acquisition of business by the two companies shall be eliminated.

"(7) Such steps shall be taken as may be necessary to divorce printing business from insurance business so that the printing business and other independent activities of the Association and the operation of the Insurance Company may be carried on separate and apart from each other."

It is well said, in the appellant commissioner's brief:

"Having itself run out of funds, the agency corporation by progressive changes in its contracts has dumped the financial burden of its sales program onto the policyholders of the life company. This is climaxed by the latest change in its contractual relations with the life company, consummated literally at the door of the superior court. The new contract was dated August 21, 1947, was to be effective as of July 1, 1947, but wasn't actually consummated until

September 13, 1947,—which was nine days after the Insurance Commissioner gave notice of revocation of the life company's certificate of authority (Ex. Q), and just two days before trial of these actions commenced.

"Under this contract the entire cost of and responsibility for the promotion and acquisition of business is assumed by the life company (Exhibit Z, p. 560). The agency corporation assumes no responsibility for the production of business, yet is to receive 3% of all insurance premiums, plus 2% additional of all premiums on policies in force five years or more. This income to the agency corporation is presumably to be in perpetuity since the contract contains no provisions for its expiration or termination. (Ex. Z, pp. 559 to 561.) Under the new contract likewise, the agency corporation's indebtedness to the life company, which amounted to $250,046.38 (principal and accrued interest) as at May 31, 1947, was wiped off (Ex. Z, p. 561) by the transfer to the life company by the agency corporation of certain furniture, fixtures, supplies, and accounts receivable. . . .

"Thus, while remaining in full control of the life company's affairs through interlocking officers and trustees and an indissoluble pattern of influence, the agency corporation now throws the entire burden of its expensive sales program onto the policyholders, rids itself of all past accumulated financial obligations toward the life company, and is to receive up to 5% of the life company's premium income in perpetuity without responsibility and whether the life company's financial condition is good or bad. . . .

"That the involvement of the agency corporation in the affairs of the life company constitutes a hazardous condition in the life company is amply borne out by the testimony of H. S. Tressel, the actuarial and legal expert who testified as a witness for respondents. When he viewed the operations of the life company during the summer of 1947, he concluded that the 'big item' was to divorce the company's operations from the agency corporation and to reduce commissions. . . . He felt that the agency corporation could have been divorced from the life company's affairs in the past. He stated that it was 'practically necessary' that the agency corporation remain divorced from the life company's affairs, that savings be effected in its operations, and that his other recommendations be carried out."

It may well be doubted whether the two companies are effectually divorced by the contract. Paragraphs 3, 4, and 7 of the contract, hereinbefore quoted, are clearly steps in that direction. However, the minutes of the meeting of the board of trustees of the insurance company, which authorized the contract on the part of the company, are somewhat disquieting. We quote briefly from the minutes of that meeting:

"Whereupon there was a discussion relative to the Harry S. Tressel Report and its effect on the Life Company as well as the benefits to be derived by investors in the Federal Association, Inc. Whereupon the following resolution was moved by George M. Jacobs, seconded by E. C. Woepse, and unanimously carried:

"RESOLVED: That the discussed contract be adopted and be dated August 21, 1947, and be included in these minutes, 'and is retroactive to July 1, 1947.'"

In our opinion, this indicates that the old-time consideration of the officers of the insurance company for the financial welfare of the investors of the Federal Association was still in mind when the contract was authorized on August 21, 1947, and lends support to the commissioner's position that the condition of the insurance company is hazardous to its policyholders.

It is said, in *Caminetti v. Guaranty Union Life Ins. Co.*, 52 Cal. App. (2d) 330, 126 P. (2d) 159:

"Further contentions presented by the appellant are disposed of as follows: . . .

"(b) That the evidence does not support the commissioner's holding that the payment of the salaries complained of involved a hazardous condition as defined in subdivision (d) of section 1011 of the Insurance Code; said subdivision and section only means financial hazard.

"Did the withdrawal of these funds constitute a hazardous condition as defined by the Insurance Code? To follow to its conclusion appellant's argument that there could be no hazard to policyholders so long as the business is solvent, would be to sanction the withdrawal of policyholders' money in the payment of excessive salaries without restriction. This is not the law. Excessive withdrawal of policyholders' funds continued long enough will eventually render any company insolvent, and thus destroy the very

purpose of the payment of insurance premiums. The people of the state and interested policyholders have a vital interest in this. There is no requirement of our Insurance Code that the Insurance Commissioner must wait until an insurance company is insolvent before he takes action to protect the policyholders. To so hold would be to apply the ancient aphorism about locking the barn door after the horse is stolen.

"Along with other meanings, the Standard Dictionary defines the noun 'hazard' as exposure to the chance of loss or injury, and the adjective 'hazardous' as involving risk of loss. It is in this sense that subdivision (d) of section 1011 of the Insurance Code must be read. If the management of the insurance company so conducts its business that there is loss, or risk of loss to the policyholders, it becomes the duty of the Insurance Commissioner to take possession of the company's assets and to conduct its business as conservator. This is the meaning of the word 'hazardous' as used in the statute.

"The Insurance Code contains ample authority for the reorganization or rehabilitation of insurance companies taken over by the insurance commissioner, so that they may resume normal business, if that be possible. Liquidation does not necessarily need to follow conservatorship.

. . .

"The office of Insurance Commissioner and the code of procedure enacted into law by our legislature, denominated the Insurance Code, are designed to insure that an officer of the state will be vigilant to protect the rights of the true owners of every insurance business conducted in California, whether that business be mutual or proprietary in character."

See, also, *Caminetti v. State Mutual Life Ins. Co.*, 52 Cal. App. (2d) 321, 126 P. (2d) 165.

It is further said, in the first of the *Caminetti* cases above cited:

"The Insurance Commissioner of the State of California is a public officer, clothed with the power of the State. The business of insurance is one charged with a public interest. Upon consideration of whether or not the commissioner was justified in taking over an insurance company, he is entitled to the presumption that his official duty has been regularly performed. (Subd. 15, § 1963, Code of Civ. Proc.) This presumption applies to the finding of the commissioner

in this case that after an examination appellant corporation was in such condition that its further transaction of business would be hazardous to its policyholders, or creditors, or to the public. (Subd. d, § 1011, Ins. Code.)"

That is also true in this state. The record in this case shows that its insurance commissioner has been vigilant. It is probable that, in his frequent disagreement with the officers of the Federal Old Line Life Insurance Company (Mutual), he has sometimes been mistaken. We are convinced, from a study of the voluminous record in this case, that all measures he has taken have been taken in good faith, and in pursuance of what he conceived to be his duty in the premises. We are further convinced that he was generally right.

The decree appealed from will be reversed, except in so far as it exonerates the surety on a bond posted by the insurance company in connection with the issuance of a temporary restraining order. We are mindful of the fact that, in reversing the decree, we dissolve the injunction by which the commissioner was "hereby permanently restrained and enjoined from attempting to enforce the said notice of cancellation of the plaintiff's license dated September 4, 1947." However, the dissolution of the injunction is of little moment. At the time it was granted, November 7, 1947, the 1947 insurance code had been in effect since October, replacing all former life insurance statutes and codes. Presumably, if the commissioner further pursues the matter herein involved, he will, no doubt, act under the 1947 code. Under such circumstances, wholly different questions will be raised than have been raised in this case.

The two causes are remanded to the superior court of Thurston county, with direction to cancel the joint decree appealed from and dismiss both actions.

JEFFERS, C. J., BEALS, STEINERT, and MALLERY, JJ., concur.

June 11, 1949. Petition for rehearing denied. SIMPSON, J., dissents.