[No. 38116. En Banc. September 29, 1966.]

LEE I. KUECKELHAN, *Respondent*, v. FEDERAL OLD LINE IN-
SURANCE COMPANY (MUTUAL), *Appellant.*\*

\*Reported in 418 P.2d 443.

*Hay, Julin, Fosso & Sage* (*Eugene H. Sage,* of counsel), *J. R. Cissna,* and *Brodie, Fristoe & Taylor* (*Doane Brodie,* of counsel), for appellant.

*The Attorney General, Basil L. Badley, Assistant, Daniel Brink* and *Francis Hoague, Special Assistants,* for respondent.

HAMILTON, J.—RCW 48.31.030[1] permits the Insurance

---

[1]"The commissioner may apply for an order directing him to rehabilitate a domestic insurer upon one or more of the following grounds: That the insurer

"(1) Is insolvent; or

"(2) Has refused to submit its books, records, accounts or affairs to the reasonable examination of the commissioner; or

Commissioner, for cause and under judicial supervision, to take possession of a domestic insurance company as a statutory rehabilitator. Respondent, Insurance Commissioner, acting under this statutory provision, initiated this action against appellant, Federal Old Line Insurance Company, a domestic mutual company. The Superior Court for King County entered an order directing rehabilitation and empowered respondent to take possession of appellant's assets, books, records, and files and to conduct its business.

It is from this order that the instant appeal is taken.

■ A rehabilitation action under RCW 48.31.030 is designed to accomplish the conservation of an insurance com-

"(3) Has failed to comply with the commissioner's order, made pursuant to law, to make good an impairment of capital (if a stock insurer) or an impairment of assets (if a mutual or reciprocal insurer) within the time prescribed by law; or

"(4) Has transferred or attempted to transfer substantially its entire property or business, or has entered into any transaction the effect of which is to merge substantially its entire property or business in that of any other insurer without first having obtained the written approval of the commissioner; or

"(5) Is found, after examination, to be in such condition that its further transaction of business will be hazardous to its policyholders, or to its creditors, or to its members, subscribers, or stockholders, or to the public; or

"(6) Has wilfully violated its charter or any law of this state; or

"(7) Has an officer, director, or manager who has refused to be examined under oath, concerning its affairs, for which purpose the commissioner is authorized to conduct and to enforce by all appropriate and available means any such examination under oath in any other state or territory of the United States, in which any such officer, director or manager may then presently be, to the full extent permitted by the laws of any such other state or territory, this special authorization considered; or

"(8) Has been the subject of an application for the appointment of a receiver, trustee, custodian or sequestrator of the insurer or of its property, or if a receiver, trustee, custodian, or sequestrator is appointed by a federal court or if such appointment is imminent; or

"(9) Has consented to such an order through a majority of its directors, stockholders, members, or subscribers; or

"(10) Has failed to pay a final judgment rendered against it in any state upon any insurance contract issued or assumed by it, within thirty days after the judgment became final or within thirty days after time for taking an appeal has expired, or within thirty days after dismissal of an appeal before final determination, whichever date is the later." RCW 48.31.030.

pany. In such an action, the court is authorized to appoint the Insurance Commissioner as rehabilitator, with the end in view of correcting and removing the causes and conditions which project the need for rehabilitation. RCW 48-.31.040(1)[2] When rehabilitation has been accomplished, the assets and property of the company will be turned back to the insurer. RCW 48.31.040(3).[3]

At the outset, and by way of background for the discussion to follow, it should be observed that RCW 48.09-.270[4] provides that the policies of mutual life insurance companies, such as appellant, must maintain a condition permitting the assessment of policyholders, i.e., the owners of the company, until the company has acquired a surplus of over $100,000. When computing the amount of this surplus, or for otherwise determining compliance with provisions of the insurance code and/or any issues of financial condition, not all of a company's claimed assets are con-

___

[2] "(1) An order to rehabilitate a domestic insurer shall direct the commissioner forthwith to take possession of the property of the insurer and to conduct the business thereof, and to take such steps toward removal of the causes and conditions which have made rehabilitation necessary as the court may direct." RCW 48.31.040(1).

[3] "(3) The commissioner, or any interested person upon due notice to the commissioner, at any time may apply for an order terminating the rehabilitation proceeding and permitting the insurer to resume possession of its property and the conduct of its business, but no such order shall be granted except when, after a full hearing, the court has determined that the purposes of the proceedings have been fully accomplished." RCW 48.31.040(3).

[4] "(1) A domestic mutual insurer on the cash premium plan, after it has established a surplus not less in amount than the minimum capital funds required of a domestic stock insurer to transact like kinds of insurance, and for so long as it maintains such surplus, may extinguish the contingent liability of its members to assessment and omit provisions imposing contingent liability in all policies currently issued.

"(2) Any deposit made with the commissioner as a prerequisite to the insurer's certificate of authority may be included as part of the surplus required in this section.

"(3) When the surplus has been so established and the commissioner has so ascertained, he shall issue to the insurer, at its request, his certificate authorizing the extinguishment of the contingent liability of its members and the issuance of policies free therefrom." RCW 48.09.270.

sidered admissible to the balance sheet. Those which are deemed admissible, generally speaking, are assets which are not prohibited or proscribed by the insurance code. RCW 48.12.010 and 48.12.020. These assets then are characterized as "admitted" assets, to be balanced against the liabilities, in determining the issue of code compliance, financial condition, or amount of required surplus. *Cf. Federal Old Line Ins. Co. v. Sullivan*, 33 Wn.2d 358, 206 P.2d 311 (1949).

In 1956, appellant filed a financial statement with the respondent showing a sufficient surplus to permit removal of the contingent liability condition. Before the condition could be removed, however, it was necessary to have an examination of appellant's books by the respondent. This examination occurred in 1957, following which respondent ruled that certain of appellant's claimed assets were not admissible. Appellant's surplus was accordingly reduced below the requisite amount, thus precluding removal of the condition at that time. Appellant's annual statements thereafter showed, in each succeeding year, a surplus greater than the year before. Its further requests for removal of the condition suggested another examination of its books, which in turn gave rise to this action.

The circumstances precipitating respondent's petition for rehabilitation reveal that between 1953 and 1956 appellant entered upon an investment program involving the purchase of real estate, real-estate contracts, and real-estate mortgages in a shopping center development located in a relatively circumscribed unincorporated area, designated as Federal Way in southern King County, Washington. On December 31, 1956, appellant's books revealed a total of $4,655,544.11 in assets, $1,814,544.45 of which was represented by notes and mortgages on property in the Federal Way Shopping Center complex. This concentration of investments was criticized in respondent's report of the 1957 examination. This criticism was apparently ignored by appellant, for, by September, 1962, it had increased its mortgage investments in the Federal Way shopping area to $3,960,401.04 out of claimed assets of over $7 million.

The substantial increase in real-estate based investments was in part attributed to a contract which appellant entered into with Federal Shopping Way, Inc., in January, 1957. The terms of the contract provided that appellant would provide $2,500,000 in additional mortgage financing to tenants of the shopping center which Federal Shopping Way, Inc., was interested in developing. In return for this financing, Federal Shopping Way, Inc., agreed to guarantee payment of the mortgages and to permit additional area financing subordinate to appellant's mortgages.

In the meantime, another corporation, named Federal Association, Inc., which had long operated under an agency contract with appellant in promoting appellant's business activities, also decided to aid in the development of the shopping area by providing initial financing for tenants. To facilitate the various financing arrangements, tenant companies (known as "cooperating companies")[5] were organized and pledged the majority of their stock to Federal Association, Inc.

Subsequent to execution of the January, 1957, contract the legislature enacted Laws of 1957, ch. 193, § 8 (RCW 48.13.265),[6] which prohibited insurance companies from having more than 65 per cent of their investments in real-estate based assets. Appellant thereafter took the position that the passage of that act did not affect its contract which was in existence prior to the existence of the act.

Time passed and the Federal Way shopping area began to grow. Appellant, in the meantime, obtained comprehensive and optimistic appraisals of the area. Based upon these appraisals, appellant considered the mortgages given by

---

[5] The mortgages executed by the "cooperating companies" comprise the investment about which revolve the contentions of the parties upon the issue of admissible assets.

[6] "An insurer shall not invest or have invested at any one time more than sixty-five percent of its assets in investments in real estate, real estate contracts, and notes, bonds and other evidences of debt secured by mortgage on real estate, as described in RCW 48.13.110 and 48.13.160. Any insurer which, on the effective date of this act, has in excess of sixty-five percent of its assets so invested shall not make any further such investments while such excess exists." RCW 48.13.265.

the "cooperating companies" to be within the requirement of RCW 48.13.120[7] that mortgaged property be worth at least one third more than the principal amount of the mortgage.

It appears that the original mortgages taken by appellant from the "cooperating companies" were principally upon property located in the western section of the Federal Way shopping area, and that the holdings of some of such companies were of noncontiguous parcels. In 1963, it was decided that it would be in the best interests of all concerned if the land holdings of these companies would be reorganized. The purpose of this reorganization was to vest title in the "cooperating companies" to contiguous parcels of property with greater emphasis on property in the eastern section of the shopping area. Ostensibly this would allow more logical development of the property and ultimately provide greater security for the mortgages.

Appellant participated in this proposed reorganization by accepting new mortgages on the reallocated parcels of property in lieu of the mortgages which it held at that time. The new mortgages, which were given in exchange for appellant's "book" satisfaction of the former mortgages, had a higher face value, a greater though deferred interest rate, and shorter maturities.

In October, 1960, respondent dispatched examiners to appellant's offices. The examination continued until 1963. Following review of the examiners' report, respondent on

---

[7] "(1) No mortgage loan or investment therein upon any one parcel of real property shall exceed in amount at the time of acquisition:

"(a) Seventy-five percent of the fair value of the property if the property is a dwelling house primarily intended for occupancy by one family and the loan is required to be amortized within not more than twenty-five years by payment of installments thereon at regular intervals not less frequent than every three months; or

"(b) sixty-six and two-thirds percent of the fair value of the property in all other cases.

"(2) The extent to which a mortgage loan made under subdivision (3) or (4) of RCW 48.13.110 is guaranteed or insured by the Federal Housing Administration or guaranteed by the Administrator of Veterans' Affairs may be deducted before application of the limitations contained in subsection (1) of this section." RCW 48.13.120.

May 28, 1963, issued Order No. 201, entitled "Notice and Order to Make Good a Deficiency." This order was premised on RCW 48.09.340,[8] and stated that respondent had determined that appellant's admissible assets fell below the amount of its liabilities plus the amount of required surplus. This order gave appellant the statutory 90 days in which to make good the deficiency, and advised of the prospects in the event of failure.

Appellant countered that the company was solvent; that it had substantial assets; that in its over-all history it had never failed to honor a policyholder's claim; and that it had never been involved in a lawsuit brought against it by a policyholder, beneficiary, or applicant.

Extensions of time for compliance with Order No. 201 were granted, following which appellant demanded an administrative hearing on the validity of the order. A hearing was commenced and lasted for 8 days. Before any decision was rendered, however, respondent commenced the instant action.

The underlying basis upon which Order No. 201 was issued and the instant action instituted was respondent's conclusion that appellant's persistent and insistent pursuit of and adherence to its prevailing investment policies in the Federal Way shopping area rendered further transaction of business hazardous to its policyholders and owners, its creditors, and the general public.

---

[8] "(1) If the assets of a domestic mutual insurer on the cash premium plan fall below the amount of its liabilities, plus the amount of any surplus required by this code for the kinds of insurance authorized to be transacted, the commissioner shall at once ascertain the amount of the deficiency and serve notice upon the insurer to cure the deficiency within ninety days after such service of notice.

"(2) If the deficiency is not made good in cash or in assets eligible under this code for the investment of the insurer's funds, and proof thereof filed with the commissioner within such ninety-day period, the insurer shall be deemed insolvent and shall be proceeded against as authorized by this code.

"(3) If the deficiency is not made good the insurer shall not issue or deliver any policy after the expiration of such ninety-day period. Any officer or director who violates or knowingly permits the violating of this provision shall be subject to a fine of from fifty dollars to one thousand dollars for each violation." RCW 48.09.340.

The trial court agreed, and in essence found and concluded that appellant had, with its investments in the shopping area, transcended proscriptions of the insurance code in the following respects: (a) Invested more than 4 per cent of its assets with a single entity, contrary to the limitation of RCW 48.13.030; (b) invested in mortgage loans which exceeded 66⅔ per cent of the fair value of the mortgaged property, contrary to the limitation of RCW 48.13.120; (c) invested more than 65 per cent of its assets in real-estate loans contrary to the limitation of RCW 48.13.265; (d) permitted or acquiesced in the continued existence of prior encumbrances or clouds upon the title of the mortgaged property, which rendered the mortgages inadmissible as assets by virtue of RCW 48.13.110 and 48.13.130;[9] (e) engaged in practices relative to the mortgages it held, *e.g.*, crediting delinquent interest by increasing the face amounts of the mortgages, thereby reflecting an incorrect picture as to the income and the status of the mortgages; and (f) failing to comply with respondent's order of May 28, 1963, to correct impairment of assets.

On appeal, appellant makes eight assignments of error directed to the trial court's action in ordering rehabilitation. One of the assignments embraces two constitutional challenges, and the remaining seven essentially concern themselves with factual findings and the consequences flowing therefrom. We will discuss the constitutional challenges and those assignments directed to what we deem the significant and controlling findings.

---

[9]"An insurer may invest any of its funds in:

"(1) (a) Bonds or evidences of debt which are secured by first mortgages or deeds of trust on improved unencumbered real property located in the United States; . . . ." RCW 48.13.110.

"(1) Real property shall not be deemed to be encumbered within the meaning of RCW 48.13.110 by reason of the existence of:

". . . .

"(b) Liens for taxes or assessments not delinquent, or liens not delinquent for community recreational facilities, or for the maintenance of community facilities, or for service and maintenance of water rights; . . . ." RCW 48.13.130.

## I

### CONSTITUTIONALITY OF THE INSURANCE CODE

Appellant's first attack upon the order of the trial court is that the insurance code is unconstitutional, thus depriving the trial court of jurisdiction over the instant proceedings. This argument is two pronged.

The first prong is that the code, Laws of 1947, ch. 79, p. 189, is invalid because it violates Const. art. 2, § 19, which requires that "No bill shall embrace more than one subject, and that shall be expressed in the title." In this respect, appellant maintains that the act embraces two distinct and separate subjects—one relating to the regulation of insurance, and the other to the establishment and duties of the State Fire Marshall.

The title to Laws of 1947, ch. 79, p. 189, reads:

> AN ACT to provide an Insurance Code for the State of Washington; to regulate insurance companies and the insurance business; to provide for an Insurance Commissioner; to establish the office of State Fire Marshall; to provide penalties for the violation of the provisions of this act; to repeal certain existing laws and to amend section 73 of chapter 49, Laws of 1911 as last amended by section 1 of chapter 103, Laws of 1939.

The primary import of the act was to establish a broad comprehensive code to govern the insurance industry in this state. *Cf. Davis-Kaser Co. v. Colonial Fire Underwriters Ins. Co.,* 91 Wash. 383, 157 Pac. 870 (1916). The title expresses this objective and is general in nature, rather than restrictive. Concerning such a title, in *Gruen v. State Tax Comm'n,* 35 Wn.2d 1, 22, 211 P.2d 651 (1949), *overruled on other grounds, State ex rel. Finance Comm. v. Martin,* 62 Wn.2d 645, 384 P.2d 833 (1963), we said:

> A general title may be said to be one which is broad and comprehensive, and covers all legislation germane to the general subject stated. It is not an objection that it covers more than the subject of the body of the act, but it must not, in any event, cover less. It is not necessary that it index the details of the act, or give a synopsis of the means by which the object of the statute is to be

accomplished. All matters which are germane to the subject may be embraced in one act. Under the true rule of construction, the scope of the general title should be held to embrace any provision of the act, directly or indirectly related to the subject expressed in the title and having a natural connection thereto, and not foreign thereto. Or, the rule may be stated as follows: Where the title of a legislative act expresses a general subject or purpose which is single, all matters which are naturally and reasonably connected with it, and all measures which will, or may, facilitate the accomplishment of the purpose so stated, are properly included in the act and are germane to its title.

The basic purposes of the constitutional mandate regarding the title to legislation is to enlighten the legislature and the general public as to what matters are being considered for legislation and to prevent logrolling in the legislative process. *Young Men's Christian Ass'n v. State,* 62 Wn.2d 504, 383 P.2d 497 (1963). However, this constitutional requirement is to be liberally construed so as not to impose awkward and hampering restrictions upon the legislature. *DeCano v. State,* 7 Wn.2d 613, 110 P.2d 627 (1941). Consequently, the legislature is deemed the judge of the scope which it will give to the word "subject." *Marston v. Humes,* 3 Wash. 267, 28 Pac. 520 (1891), *overruled on other grounds, In re Shilshole Ave.,* 101 Wash. 136, 172 Pac. 338 (1918). So long as the title embraces a general subject, it is not violative of the constitution even though the general subject contains several incidental subjects or subdivisions. *Robison v. Dwyer,* 58 Wn.2d 576, 364 P.2d 521 (1961); *Washington Toll Bridge Authority v. State,* 49 Wn.2d 520, 304 P.2d 676 (1956). All that is required is that there be some "rational unity" between the general subject and the incidental subdivisions. If this nexus can be found, the act will survive the light of constitutional inspection. *State ex rel. Toll Bridge Authority v. Yelle,* 61 Wn.2d 28, 377 P.2d 466 (1962).

Such unity exists in an act which creates a comprehensive insurance code, establishes the combined offices of Insurance Commissioner and State Fire Marshall, and

defines the duties and responsibilities of the respective offices. The relationship between fire insurance regulation and rating, fire loss, fire prevention, and fire investigation is rational and reasonable. To hold otherwise would ignore modern day realities. Moreover, we believe that the title of the code was properly instructive to the legislature and the public. In short, we find no evidence of the evils which the constitutional provision was designed to avoid.

The second prong of appellant's challenge to the constitutionality of the insurance code is being raised for the first time on appeal.[10] It is appellant's position that the insurance code violates Const. art. 2, § 1 (amendment 7),[11] which vests the legislative authority of the state in the legislature.

Appellant's reasoning on this issue is (1) the grant of rehabilitation authority to the Insurance Commissioner is an unconstitutional delegation of legislative power; (2) the grant of rehabilitation supervision to the superior court is likewise an invalid delegation of power; and (3) even if the delegation be otherwise proper, it is void because of the lack of adequate statutory rules and standards.

Realism dictates that we acknowledge that the legislature may delegate its powers to administrative agencies "to fill up the details and to make rules and regulations." *State ex rel. Wisconsin Inspection Bureau v. Whitman*, 196 Wis. 472, 506, 220 N.W. 929 (1928); 1 Davis, Administrative Law § 2.07 (1958). Courts have long recognized that the legislature may—and indeed in many instances must—enact statutes in broad outline, leaving to administrative officials the duty of arranging the details. But, while some delegations of legislative power will be void, others will be valid. The distinguishing characteristic between the two is that

---

[10]Since this issue relates to the jurisdiction of the trial court over the instant case, it makes no difference that it was not raised in that court. *Cf. State v. Davis*, 41 Wn.2d 535, 250 P.2d 548 (1952); Rule on Appeal 43, RCW vol. 0.

[11]"The legislative authority of the state of Washington shall be vested in the legislature, consisting of a senate and house of representatives, which shall be called the legislature of the state of Washington, . . . ." Const. art. 2, § 1 (amendment 7).

the valid delegations will define what is to be done, and will outline the scope of the instrumentality's authority by prescribing reasonable standards and guidelines. *State ex rel. Pruzan v. Redman,* 60 Wn.2d 521, 374 P.2d 1002 (1962); *Keeting v. PUD No. 1 of Clallam Cy.,* 49 Wn.2d 761, 306 P.2d 762 (1957).

Of course, before a legislature may step in and delegate power to one of its agencies, it must possess the constitutional authority to regulate the activity which is the subject of the delegation. In the instant case, this subject is the insurance industry.

There can be little doubt that the insurance industry bears such a relation to the public welfare as to render persons and businesses engaged in it subject to regulation under the state's police power. *German Alliance Ins. Co. v. Hale,* 219 U.S. 307, 55 L. Ed. 229, 31 Sup. Ct. 246 (1911); *Continental Ins. Co. v. Fishback,* 154 Wash. 269, 282 Pac. 44 (1929); 1 Richards, Insurance § 39 (1952); 2 Couch, Insurance § 21:1 (2d ed. 1959); Annot., 10 A.L.R.2d 950 (1950); RCW 48.01.030.[12] Since the legislature cannot be expected to constantly supervise the industry, it is natural that it would delegate this power to the state official qualified to act in this area: the Insurance Commissioner.

In keeping with the power of regulation, the state, on behalf of the public, necessarily acquires a vital interest in the financial well being of an insurance company. In recognition of this interest, some state legislatures, including our own, have included in their insurance codes provisions for the protection of policyholders, creditors, and the general public, through rehabilitation. Such statutes have been held to be constitutional. *Carpenter v. Pacific Mut. Life Ins. Co. of California,* 10 Cal.2d 307, 74 P.2d 761 (1938); *aff'd Neblett v. Carpenter,* 305 U.S. 297, 83 L. Ed. 182, 59 Sup. Ct. 170 (1938); *Application of People, by Van Schaick,*

---

[12]"The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters. Upon the insurer, the insured, and their representatives rests the duty of preserving inviolate the integrity of insurance." RCW 48.01.030.

239 App. Div. 490, 268 N.Y.S. 88 (1933), *aff'd* 264 N.Y. 473, 191 N.E. 521 (1934); 2 Couch, Insurance § 22:11 (2d ed. 1959); 44 C.J.S. *Insurance* § 135a (1) (1945). Thus, the legislature has the power to enact a statute providing for rehabilitation through the Insurance Commissioner without running afoul of the constitution. But, the extent to which that power may be exercised must be determined from the legislation and, where so provided, be supervised by the courts. *Application of People, by Van Schaick, supra;* 44 C.J.S. *Insurance* § 135a (1) (1945).

The court's sole and proper function in rehabilitation proceedings is to direct—that is, to supervise and review—the actions of the Insurance Commissioner while he is operating the seized insurance company. The courts cannot dictate or outline the general policy or course of conduct of the Insurance Commissioner or his department (*Calvin Phillips & Co. v. Fishback*, 84 Wash. 124, 146 Pac. 181 (1915)), because this outline is dependent on the terms of the applicable statutory provisions and not upon judicial discretion. Our statutory provisions, therefore, properly place the responsibility on both the Insurance Commissioner and the courts, the Commissioner being required to follow the statutory mandates and to use reasonable discretion in the rehabilitation of a seized company, with abuses of discretion to be checked by the judiciary. See, generally, 2 Couch, Insurance § 22:18 (2d ed. 1959).

In this capacity, the court is acting much in the same manner as it acts when overseeing a trust or probate; only in this instance, it is reviewing the Insurance Commissioner who is acting like a receiver or trustee and as an officer of the state. 2 Couch, Insurance § 22:16 (2d ed. 1959); *Anderson v. Great Republic Life Ins. Co.*, 41 Cal. App. 2d 181, 106 P.2d 75 (1940). Moreover, the Insurance Commissioner is not acting as an agent of the courts. He holds his position as rehabilitator by force of legislative enactment, confirmed by court appointment. Consequently, the court's power of discretion, vis-a-vis the Insurance Commissioner, is curtailed by the Commissioner's statutory powers and the statutes governing the management of insurance com-

panies and rehabilitation proceedings. 44 C.J.S. *Insurance* § 135a (1) (1945).

This then is the role carried on by our courts under our laws relating to statutory rehabilitation. The court does not conduct the business of the seized company. This task is assigned by the legislature to the Insurance Commissioner who acts to protect the general public, the policyholders and owners of the company, and the company itself.

We thus come to the third phase of appellant's argument on the issue of delegation, that is, that respondent's and the court's duties are not sufficiently defined or circumscribed by adequate statutory guidelines.

■ In approaching this contention, it should be remembered that the process of insurer rehabilitation is preferred to that of liquidation, and that the objective is to correct practices which are proscribed by the insurance code or which are hazardous to policyholders, creditors, or the public. Within the framework of this objective, and the detailed provisions of the insurance code, the respondent is told to "take such steps toward removal of the causes and conditions which have made rehabilitation necessary." RCW 48.31.040 (1).

Certainly, the precise steps which respondent will take in any given case could not be spelled out with any degree of specificity. The exigencies of the operation of an insurer's business make such extensive legislation highly impractical. The respondent, however, is by no means a wholly free agent with unbridled discretion as to what he may do in rehabilitating a seized company. The insurance code is replete with insurer management standards and guidelines. Not only must respondent comply with these provisions of the code, he is also subject to the court's review relative to his compliance and/or abuse of discretion. Herein, then, lies the guarantee of appellant's substantive and procedural safeguards and standards.

Consequently, the vice which existed in the case of *Peterson v. Hagan*, 56 Wn.2d 48, 351 P.2d 127 (1960) is not present in the instant case. The insurance code, as opposed

to the statute then under consideration, is not devoid of any legislatively declared purpose or guidelines for the operation of insurance companies. On the contrary, the code lays down definitive and comprehensive standards in this respect.

We find no violation of Const. art. 2, § 1 (amendment 7).

## II

### INVESTMENTS WITH A SINGLE ENTITY EXCEEDING FOUR PER CENT OF APPELLANT'S ASSETS

RCW 48.13.030, in pertinent part, provides:

An insurer shall not, except with the consent of the commissioner, have at any time any combination of investments in or loans upon the security of the obligations, property, and securities of any one person, institution, or municipal corporation aggregating an amount exceeding four percent of the insurer's assets.

The trial court found that the "cooperating company" mortgagors were, in the management of the various parcels of land, so dominated and controlled by Federal Shopping Way, Inc., and Federal Association, Inc., as to render the mortgagors single entities with each and both such corporations. More than 4 per cent of appellant's assets were invested in "cooperating company" mortgages. This led the trial court to the conclusion that appellant was in violation of RCW 48.13.030, which, in turn, rendered the amount of the mortgages in excess of 4 per cent inadmissible as assets.

The findings of the trial court on this issue are in substantial part as follows:

The entire voting stock in the mortgagor corporations listed below [eleven of the "cooperating corporations"] is substantially owned by Federal Association, Inc. In each case an individual has an option to purchase the stock from Federal Association, Inc. for a certain price, but until that option is exercised the full control of the mortgagor corporation is in Federal Association, Inc. While most of these corporations have some activities other than related to the mortgaged land, it is evident that the managing personnel have no involvement in

the land or what happens to it, but hold it, convey it or mortgage it as a mere accommodation for the defendant [appellant], Federal Association, Inc. and Federal Shopping Way, Inc. Federal Association, likewise, regards the mortgagor corporation as a mere extension of itself, insofar as the land and mortgage is concerned. These corporations together with Federal Association, Inc. constitute a single entity for the purpose of dealing with the mortgaged land. Finding of Fact No. 19.

Federal Shopping Way, Inc. has an option to purchase all of the property in the Federal Shopping Way area which is the subject of the 19 mortgages in Exhibit 64. It has exercised this option. Under the terms of the resulting contract, each nominal owner of the land has deposited in escrow deeds of all its land to Federal Shopping Way, Inc. which deeds are to be recorded at such time as the mortgage to the defendant has been paid in full. Federal Shopping Way, Inc. guarantees the payment of each of the 19 mortgages and in fact makes whatever payments of principal and interest are made on them. In the meantime, Federal Shopping Way, Inc. by agreement leases the premises in its own name, collects the rents and applies the rent receipts as it determines best, makes plans and constructs buildings as it deems desirable, makes such payments on the mortgages as it wishes. When on December 20, 1963, all of the mortgagor corporations quitclaimed their titles to Shopping Center Management, Inc. and received back other lands and buildings, it is apparent that the choice of what and how much land each received was a matter of indifference to the mortgagor corporations. The proceeds of the mortgage loans appear to go elsewhere than to the mortgagor, in most instances to Federal Shopping Way, Inc. Interestingly enough, Federal Shopping Way, Inc. carries the entire land Federal Shopping Way as its assets on its books and the mortgages to the defendant [appellant] as its liabilities. All of the above has been fully known by the defendant and associated corporations.

The mortgagor corporations appear to be technically separate from each other and except for Federal Association, Inc.'s ownership of some of them [eleven] do not have noticeably interlocking directorates. Most have some form of business activity and function totally disconnected with the land or mortgage. Nevertheless, the ownership, management, mortgaging and disposal of land

subject to mortgages to the defendant is totally in the control and management of Federal Shopping Way, Inc., and the mortgagors and Federal Shopping Way, Inc., constitute a single entity for the purpose of dealing with the land. The mortgagors are completely subservient to the desires of Federal Shopping Way, Inc. in this respect. Finding of Fact No. 20.

While there is evidence that the Commissioner's staff and therefore the Commissioner knew that the mortgagors were not total strangers to the defendant [appellant] and to Federal Association, Inc. and Federal Shopping Way, Inc., there is no evidence that the Commissioner or any member of his staff were aware of the extent of the unity of the mortgagors until the hearings before the Commissioner in December of 1963 and January of 1964. The examination by the insurance examiners was confined to the defendant [appellant] insurance company's books and documents made by accountants and bookkeepers and did not extend to the activities of the mortgagors except as reflected in the insurance company's records. In these records defendant went to some small effort to indicate the independence of the mortgagors and the arms-length aspect of all dealings. Even though I do censure the Commissioner's office for the lack of communication I don't think the law which in some circumstances might imply a consent by a Commissioner in rare cases can rise to that extent in this case. So I cannot imply a consent to lend more than 4% of defendant's assets to a single person or institution because the lack of communication works the other way. Before doing this it would be perfectly simple for the defendant [appellant] to have gotten a ruling one way or another. Finding of Fact No. 21.

▉▉▉ The factual findings, as distinguished from conclusions of law, contained in the foregoing findings are sustained by substantial evidence in the record. We, accordingly, will not disturb them. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183 (1959). Indeed, appellant does not seriously dispute the trial court's evaluation of the facts. Rather, appellant directs its attack to the trial court's conclusion that the facts justified disregarding the corporate entities of the "cooperating companies," and to the trial court's determination that the respondent has not "consented" to loans beyond the statutory proscription.

We cannot agree with appellant upon either score.

As to the first contention, we have, in *Superior Portland Cement, Inc. v. Pacific Coast Cement Co.*, 33 Wn.2d 169, 212, 205 P.2d 597 (1949), announced the applicable general rules as follows:

(1) It is a well-recognized principle of law that a corporation may not be used as a cloak or disguise to escape corporate liability, and that the corporate veil may be pierced when necessary to do justice in particular cases. *Platt v. Bradner Co.*, 131 Wash. 573, 230 Pac. 633; *State v. Davies*, 176 Wash. 100, 28 P. (2d) 322; *National Bank of Commerce of Seattle v. Dunn*, 194 Wash. 472, 78 P. (2d) 535; *Dummer v. Wheeler Osgood Sales Corp.*, 198 Wash. 381, 88 P. (2d) 453; 1 Fletcher, Cyclopedia Corporations (Perm. ed.) 134, § 41; Ballantine, Private Corporations (1927) 26, § 6; 18 C.J.S. 376, § 6.

(2) The foregoing principle, requiring that a corporate entity on occasion be disregarded, is especially applicable in cases involving a parent or principal corporation and subsidiary corporations which merely acquiesce in and register the decrees of their principal.

"The rule followed in many cases is that the legal fiction of distinct corporate existence may be disregarded where a corporation is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality or adjunct of another corporation. The courts will ignore separate corporate entities in order to defeat a fraud, wrong, or injustice, at least where the rights of third persons are concerned." 18 C.J.S. 382, § 7e.

"If one corporation so dominates and controls another as to make that other merely an adjunct to it, the courts will look beyond the fiction of distinct corporate entity. *Briggs & Co. v. Harper Clay Products Co.*, 150 Wash. 235, 272 Pac. 962. . . ."

In applying these rules to the instant case, it must be borne in mind that we are not here dealing with the ordinary commercial enterprise and the investments thereof. Instead, we are concerned with the investments of a mutual insurance company in which the policyholders, its creditors, and the public have a significant interest, and for which the legislature has specified clear investment limitations and has otherwise demanded a standard of conduct beyond the

ordinary. Evasion of these guidelines through the medium of security and corporate manipulation cannot be permitted.

The trial court did not err in disregarding the corporate entities of the "cooperating companies" upon the facts as it found them to be with respect to the mortgaged parcels of land.

 By its second attack under this heading, appellant contends that respondent should be estopped by past non-action from challenging the excess investment. Appellant's rationale is that "what the Commissioner could have authorized, he can be estopped to contest."

The insurance code contemplates that respondent will act by written orders and notices and with some degree of formality. His orders are not effective unless they be made in writing and are signed by him or by his authority. RCW 48.02.070.[13] Moreover, we think it unreasonable to hold respondent responsible for nonaction on matters concerning which he has not been called upon for a specific ruling, particularly where there is no compelling equity demanding such a holding.

This same estoppel argument was advanced by an insurance company in *Caminetti v. State Mut. Life Ins. Co.*, 52 Cal. App. 2d 321, 325, 126 P.2d 165 (1942). In meeting the contention, the California court stated:

> Appellant [the insurance company] presents the further argument that the state is estopped from taking over this insurance company because the commissioner

---

[13]"(1) Orders of the commissioner shall not be effective unless made in writing and signed by him or by his authority. Every order shall contain a concise statement of the grounds upon which it is based.

"(2) Every notice required to be given by the commissioner to any person shall:

"(a) Be in writing in detail sufficient reasonably to inform the person of the action taken or proposed; and

"(b) designate the provisions of this code pursuant to which action is so taken or proposed; and

"(c) state the grounds for such action.

"(3) An order or a notice may be given by delivery to the person to be ordered or notified or by mailing it, postage prepaid, addressed to him at his residence or principal place of business as last of record in the commissioner's office." RCW 48.02.070.

and his predecessors in office knew of the practices which the commissioner determined, and the court in this proceeding concluded, to be hazardous; that, knowing of these practices in years gone by, the commissioner failed to take over the company and permitted it to continue its business.

To state the contention is to state its impossibility. To govern themselves, the people act through their instrumentality which we call the State of California. The State of California functions through persons who are for the time being its officers. The failure of any of these persons to enforce any law may never estop the people to enforce that law either then or at any future time. It would be as logical to argue that the people may not proceed to convict a defendant of burglary because the sheriff perhaps saw him and failed to stop him or arrest him for another burglary committed the night before.

A decision of similar import was reached in *State ex rel. Fishback v. Globe Casket & Undertaking Co.*, 82 Wash 124, 143 Pac. 878 (1914), where we held that a prior Insurance Commissioner's construction that a company was not in the insurance business did not estop the succeeding Insurance Commissioner from proceeding against it. We then stated, at 133:

An officer of the state can, under certain circumstances, condone past offenses against the law, but he cannot grant indulgences to commit new or continuing offenses.

Respondent's consent to lend more than 4 per cent of appellant's assets to a single entity will not be implied under the facts as found by the trial court.

### III

#### INVESTMENTS IN EXCESS OF 66⅔ PER CENT
#### OF THE FAIR VALUE OF MORTGAGED PROPERTY

As noted in footnote 7, RCW 48.13.120, in pertinent part, provides:

(1) No mortgage loan or investment therein upon any one parcel of real property shall exceed in amount at the time of acquisition:

. . . .

(b) sixty-six and two-thirds percent of the fair value of the property . . . .

The trial court had before it 19 mortgages executed by the "cooperating companies," one dated April 2, 1963, and 18 dated December 20, 1963, following the land-use reorganization program. The total face value of these mortgages was $4,480,000. After considering the appraisal evidence presented, the trial court found that the mortgage loans involved exceeded 66⅔ per cent of the fair value of the mortgaged property, and disallowed them as assets. In reaching this finding, the trial court determined that the appraisals, upon which appellant predicated the loans, were based upon unrealistic and speculative assumptions concerning the property, and were not made or designed for mortgage lending purposes. Accordingly, the trial court discounted appellant's appraisals and accepted, in general, the value estimated by respondent's appraiser.

In attacking this finding, appellant cites RCW 48.13.140, which provides:

(1) The fair value of property shall be determined by appraisal by a competent appraiser at the time of the making or acquiring of a mortgage loan or investing in a contract for the deed thereon; . . . .

From this premise, appellant asserts that the trial court erred in discounting the appraisals upon which the loans were based for the reason that appellant's appraisers were in fact competent thereby justifying appellant's reliance upon them, even though they may have been mistaken in their estimates of value.

We cannot wholly agree with appellant. The trial court did not find—nor could it under the evidence—that appellant's appraisers were incompetent. Indeed, the appraisers were well qualified. Rather, the trial court found, upon the basis of substantial evidence, that the basic appraisals (a) were not current, *i.e.*, not proximate to the date of the mortgages in question; (b) were initially and primarily made upon an area basis rather than upon the individual parcels covered by the mortgages; (c) were unilaterally

transposed and extended by appellant from area appraisals to parcel appraisals at the time of the mortgages (December, 1963); (d) were based and conditioned upon extremely optimistic and factually unsupported predictions and assumptions concerning development of the property and prospective rental income; and (e) did not reflect current borrower repayment ability.

Under these circumstances, we are satisfied that the trial court did not err in determining that, in the context of the purposes and objectives of the insurance code, the appraisals did not reflect the "fair value" of the property for mortgage lending purposes at the time of the mortgages.

■■■ We have no quarrel with appellant's contention that it is entitled to rely upon the properly oriented judgment of competent appraisers in pursuing mortgage investments. However, sound business practices, consonant with the insurance code's intent to protect policyholders, require that the appraisals for insurer mortgage financing be predicated upon reasonable facts and prudently conservative projections made proximate to the date of the mortgage. Appraisals unmistakably oriented and aimed toward attracting promotional and speculative financing obviously do not fall within the contemplation of the insurance code. As heretofore indicated, the trial court found, upon substantial evidence, that appellant's appraisals fell within the latter category.

Accordingly, we conclude that the trial court did not err in discounting the appraisals and in turn relying upon the appraisal produced by respondent.

## IV

### Investments in Excess of 65% of Appellant's Assets in Real-Estate Securities

RCW 48.13.265 establishes a limitation of 65 per cent in the level of assets an insurance company may invest in real-estate based loans. The trial court found—and the finding is not disputed—that appellant, on February 20, 1964, had real-estate based investments of $5,585,657.67 out of its

total gross assets of $7,144,541.79. Thus, the percentage of investment in such assets was 78.18 per cent.

The history of these investments indicates that in January, 1957, appellant and Federal Shopping Way, Inc., entered into a contract concerning investments in the Federal Way shopping area. Under the terms of this contract, appellant agreed to provide $2,500,000 of mortgage loan financing. In exchange, Federal Shopping Way, Inc., agreed to hold the appellant harmless from losses occasioned by bond redemption, and to guarantee payment on all mortgages made by appellant to the "cooperating companies."

As previously observed, the legislature in 1957 enacted the 65 per cent limitation contained in RCW 48.13.265 as a part of the insurance code. The effective date of this statute was June 12, 1957. On that date appellant had 72.87 per cent of its investments in real-estate based assets.

At the outset, it should be observed that there is a substantial question as to whether the contract in issue was to endure for 3 or 5 years, and as to whether its terms were such as to render it fully effective as a basis for exceeding the 65 per cent limitation. In any event, even if the contract had a 5-year duration and was fully operable as an excuse for increasing the percentage of appellant's real-estate based investments, the fact remains that all 19 of the current mortgages from the "cooperating companies," increasing the amount of the loans, deferring interest payments, accelerating maturities, and covering different parcels of land, were executed *after* expiration of the contract. Against the backdrop of these circumstances the trial court, in part, found:

On the effective date of RCW 48.13.265, 73 plus or minus per cent or 8% plus or minus more than 65% of defendant's [appellant's] assets were real estate based. During the ensuing five years, until September 30, 1962, a total of $1,173,836.00 was advanced as new mortgage loans in the Federal Shopping Way area and existing mortgage loans in the area were increased by $975,803.28, or a total of $2,149,639.28 increase during the five year period. At no time during these five years were defendant's [appellant's] real estate-based investments ever reduced to the

65% limitation imposed by the statute including the grandfather clause in the statute allowing certain portions existing on the date of its effectiveness to be kept in effect.

Between September 30, 1962, and September [*sic* December] 20, 1963, well after the end of the contract obligation, defendant's [appellant's] mortgages in Federal Shopping Way were further increased by $308,449.35, and on December 20, 1963, by an additional $207,366.92. Thus, after the claimed obligation had expired, defendant [appellant] increased its real estate-based investments in the amount of $515,816.27. Thus, between the effective date of the 65% limitation and December 20, 1963, the defendant [appellant] increased its real estate-based investments by $2,665,455.55, or $165,455.55 more than defendant [appellant] claims was called for by the contract. Not only did the dollar volume of real estate-based investments increase during this six-year period, but the percentage with respect to total assets increased from 72.87% plus or minus to 78.18%.

Substantially all of the mortgages held by defendant [appellant] on June 12, 1957 have been satisfied by substitution of other mortgages and can no longer be utilized by defendant [appellant] as justification for being over 65% in real estate-based investments.

. . . .

The agreement contains a further provision:

"That Federal Shopping Way, Inc., further agrees to execute an acceleration provision on existing mortgages providing for a reduction in a principal amount to the extent of 30 per cent payable at the rate of 10 per cent a year, commencing five years from date, to-wit, January 16, 1962."

No such acceleration provision was executed and no significant principal reductions were made. On the contrary, after January 16, 1962, most mortgage principal amounts have been steadily increased, and the total of mortgages on land in the area was increased as shown above. Finding of Fact No. 13.

The plain and simple fact to be deduced from the facts presented and found by the trial court is that appellant has made no realistic effort, during or after the contractual period in question, to bring its real-estate based investments into line with the statutory limitation. Instead, it has per-

sisted in adhering to a collision course with the purpose and intent of the statutory limitation, without the benefit of any official or judicial interpretation or sanction concerning its obligations under the contract, its concentration of investments, or the increasing principal amounts of its mortgages.

The trial court was warranted in disallowing from admitted assets the amount of appellant's real-estate based investments which exceeded the 65 per cent limitation.

## V

### ENCUMBRANCES UPON MORTGAGED PROPERTIES

The trial court found that the properties in Federal Way shopping area upon which appellant held its mortgages were encumbered or the titles clouded by (a) liens for delinquent real-estate taxes outstanding at the time the current mortgages were executed; (b) potential real-estate transfer excise taxes arising out of unrecorded deeds and transfers of land covered by the mortgages; and (c) prior unsatisfied-of-record mortgages, labor and materialmen's liens and in some instances real-estate contracts from persons who were strangers to the mortgages. The underlying facts upon which the trial court premised its finding are for the most part either admitted or undisputed.

Appellant contends, however, that the properties should not be considered encumbered within the contemplation of the insurance code because (1) accrued and unforeclosed real-estate taxes are not disqualifying encumbrances within the contemplation of RCW 48.13.110 and 48.13.130; (2) the exchange of properties and the resultant unrecorded deeds, transfers, and other title documents accompanied the land reorganization program and resulted from a policy of accomplishing the reallocations of property and mortgages at the least possible expense; (3) the amount of any potential real-estate transfer excise tax arising from the transfers was not fixed or assessed; (4) appellant still held its original mortgages, which antedated the various unpaid taxes and unrecorded title documents, and that since the satisfactions

of such mortgages had not been recorded such mortgages could be foreclosed ahead of intervening liens or claims; (5) appellant had obtained optimistic legal opinions concerning the status of the titles and the security afforded by its mortgages in lieu of title insurance; and (6) the title deficiencies complained of do not, of themselves, warrant rehabilitation.

We, as did the trial court, find little in the way of compelling or convincing merit or weight attaching to appellant's arguments. True, isolated or occasional title confusion in property exchanges and refinancing arrangements is understandable and sometimes unavoidable. However, the confusion in the status of the titles here, occasioned by the various recorded and unrecorded title and mortgage documents, the chronically unpaid taxes, and the probability of the imposition of excise taxes in a substantial amount, casts a rather long shadow over the vitality of appellant's mortgage securities. Certainly the situation is serious enough to warrant immediate clarification and the procurement of appropriate title insurance or suitable abstracts of title. The insurance code does not contemplate or permit such loose, fluid, or unpredictable security arrangements as are evidenced here.

The trial court did not err in holding that the mortgages did not meet the requirements of RCW 48.13.110 specifying that permissible loans be secured by mortgages upon unencumbered property.

## VI

### APPELLANT'S OPERATIONS AS HAZARDOUS

The trial court found and concluded that continuation of appellant's existent investment policies rendered its operation hazardous to the policyholders, its creditors, and to the public within the purport and intent of RCW 48.31-.030(5).

In addition to the grounds heretofore discussed, the trial court found the following to be grounds for this determination: (1) The excessive concentration of investments in

a single project situated in one limited geographical area; (2) the dubious security of the Federal Shopping Way, Inc., mortgage guaranty (the trial court noted a substantial book deficit reflected in the balance sheet of that corporation); (3) an insufficient return from the mortgaged property to support the interest payments on the mortgage loans; (4) the practice of periodically increasing the face amounts of the mortgages to reflect payment of substantial amounts of unpaid interest, which in turn was credited on appellant's books as interest income; (5) the deferment of interest payments on the mortgages of December 20, 1963; and (6) the failure to consider the mortgages in default and take appropriate remedial steps consistent with appellant's investment responsibilities under the insurance code.

Appellant contends, however, that despite these findings, its operation should not be deemed hazardous because it is solvent in the ordinary business sense, has not defaulted on claims and has annual premium payment income substantially in excess of death claims.

The compelling relevance of these factors, however, is questionable. By its very nature, the assets of a life insurance company may not be called upon for a long time. Its assets, therefore, should be free of unnecessary risk and its reserves be maintained at an adequate level. Moreover, there is no requirement that the respondent must wait until disaster strikes or until an insurance company is insolvent before he is empowered to act to protect the policyholders and the public. 19 Appleman, Insurance Law & Practice § 11031 (1946); 2 Couch, Insurance §§ 22:8, 22:12 (2d ed. 1959).

The management of an insurance company must operate in such a manner, and so conduct its business, as to reduce to a minimum the risk of loss to the policyholders. And, it is the duty of respondent to see that companies so operate and to see that they operate within the framework of the policy, purpose, and requirements of the insurance code. Where the management of an insurance company conducts its business and investment policies in such a manner as to project more than a slight risk of loss to the

policyholders, its creditors and/or the public, the respondent is authorized to take appropriate steps to eliminate that risk of loss. This is the meaning of the word "hazardous" as used in the insurance code. *Cf. Federal Old Line Ins. Co. v. Sullivan,* 33 Wn.2d 358, 206 P.2d 311; *Rhode Island Ins. Co. v. Downey,* 95 Cal. App. 2d 220, 212 P.2d 965 (1949); 2 Couch, Insurance § 22:12 (2d ed. 1959).

We conclude that the trial court did not err in directing rehabilitation. Further discussion of the remaining assignments of error is unnecessary.

The order of the trial court is affirmed, and the cause is remanded to the trial court for further proceedings consistent with the provisions of the insurance code and with any intervening changes in appellant's financial affairs.

ROSELLINI, C. J., DONWORTH, FINLEY, WEAVER, OTT, and HALE, JJ., and LANGSDORF, J. Pro Tem., concur.

---

HUNTER, J. (concurring in part and dissenting in part). I concur in the majority's determination that the appellant insurance company is in violation of our applicable regulatory state statutes. I dissent to the final disposition of the case by the majority.

By reason of the unprecedented industrial development on the west side of this state, this court should take judicial notice of the substantial increase in value of real-estate assets of the appellant insurance company since the audit by the respondent Insurance Commissioner in 1963.

It is obviously much more desirable for the appellant to correct its own operations in the regular course of its business for compliance with our state statutes than for the respondent to take over the appellant's operations.

The record shows there has been a dispute as to whether the appellant's operations have been in violation of state statutes. Now that this dispute has been resolved by this court it would be much more advantageous in the protection of the appellant's assets, for *voluntary compliance by the appellant in light of the majority opinion,* than by saddling

the appellant with costs incident to a take-over by the respondent.

I would remand this case to the trial court with direction that the order directing rehabilitation be stayed, granting the appellant an additional 90 days for compliance consistent with the majority opinion.

November 22, 1966. Petition for rehearing denied.

*Reported in 419 P.2d 147.