**KENTUCKY CENTRAL LIFE INSURANCE COMPANY,**
Appellant,

v.

**Don W. STEPHENS, Commissioner of the Kentucky Department of Insurance, Appellee.**

No. 94–SC–617–TG.

Supreme Court of Kentucky.

May 11, 1995.

Charles S. Cassis, Brown, Todd & Heyburn, Louisville, Paul E. Sullivan, Thomas C. Walker, Susan Mohler, Kathryn Kendrick, Brown, Todd & Heyburn, Lexington, for appellant.

Steven L. Beshear, Janet A. Craig, Stites & Harbison, Lexington, Robert Michael Connolly, Charles J. Cronan, IV, Stites & Harbison, Louisville, Judith A. Villines, Stites & Harbison, Frankfort, for appellee.

REYNOLDS, Justice.

The statutory rehabilitation development process of Kentucky Central Life Insurance Company ("KCL"), in this case, invoked an argument that the Kentucky Insurance Commissioner ("Commissioner") lacked authority to manage the company's real estate portfolio and that an order approving a grouping of some real estate sales was erroneous.[1]

On February 11, 1993, the California Department of Insurance suspended KCL's license to conduct business in that state for the reason that the company's real estate

---

1. This Opinion relates to the first of three cases argued orally before the Supreme Court at its March 1995 term.

portfolio was substantially overvalued and consisted of nonperforming mortgage loans. On February 12, 1993, the Kentucky Insurance Commissioner filed a petition for rehabilitation against KCL. There quickly followed on February 17, 1993, an order from the Commissioner of Insurance of Nebraska that suspended the certificate or authority to transact business, and other states imposed suspension orders, including the Colorado Commissioner of Insurance who imposed similar orders on February 22, 1993.

The Commissioner's grasp of the extent of KCL's insolvency and status of all assets and liabilities required the employment of multiple experts. Ernst & Young and other experts were employed pursuant to KRS 304.33-160 to investigate the conditions of KCL and provide advice with respect to receivership, real estate management, and mortgage loans and to promulgate a plan to secure policy holder values. It was later revealed that at the time the Commissioner became rehabilitator, approximately $426 million of KCL's assets were invested in real estate, representing 40 percent of KCL's total assets. One of the first major problems which arose was a lack of an accurate valuation of KCL's real estate assets. Fifty-three percent of the real estate assets were nonperforming mortgage loans. Less than 20 percent of the real estate assets represented performing loans.

The Commissioner's duties, responsibilities, and authority emanate from an order directing the Commissioner to rehabilitate the insurer. KRS 304.33-140. The duties and power invested in the Commissioner are set forth in KRS 304.33-160. In addition to the action to reform/revitalize the insurer, the Commissioner, as rehabilitator, undertakes responsibility to manage the affairs of the insurer. Inclusive with the responsibility of management:

> He shall have all the powers of the directors, officers, and managers, whose authority shall be suspended, except as they are redelegated by the reliabilitator. He shall have full power to direct and manage, to hire and discharge employees subject to any contract rights they may have, and to

deal with the property and business of the insurer. (KRS 304.33-160[2]).

This record reflects numerous reports from the Commissioner to the court and court approval as to matters which involved KCL's real estate portfolio.

 The Insurance Code specifically prohibits control of the KCL assets by its board during the pendency of rehabilitation. It prohibits the insurer from being returned to the control of the shareholders or private management or having any of the insurer's assets returned to the control of the shareholders or private management. KRS 304.33-075. This action to prohibit the sale of the real estate assets is clearly an attempt to circumvent the insurance statutes and the orders of the trial court. The rehabilitator was provided all the powers of the directors, officers, and managers without equivocation. KRS 304.33-160(2) provides specifically that the authority of the board of directors "shall be suspended." The board of directors is without authority in a rehabilitation action other than the right to defend against a petition for liquidation. The facts herein, contrary to the board's argument, establish that the sale of the real estate assets was a decision made and approved in accordance with the rehabilitation statutes and the trial court's rehabilitation orders, with both occurring prior to any approval of liquidation. The record does not establish that the Commissioner did not attempt rehabilitation.

 However, we find that group sales may be conducted under beneficial circumstances whether the company is undergoing either rehabilitation or liquidation. As to the utilization of group sales (which the parties refer to as pool sales), rehabilitation and liquidation are not mutually exclusive.

Appellant extends the argument that pool sales were not a legitimate exercise of the Commissioner's authority as KCL's rehabilitator. There is a problem with this rationale because the court's approval of the pool sales occurred in June of 1994, being some two months prior to a court order changing the process to one of liquidation. The touchstone of this argument is based upon such evidence as appellant presented to the trial court. To the contrary, the court had sub-

stantive evidence from appellee's recognized expert witnesses. It was aware of the risk-based capital requirements which provide that insurance companies that have risky assets, such as this real estate, must have greater surplus to compensate for the risk than if the assets were cash or cash equivalents. Appellant argues that sale of real estate would not maximize the evaluation of the assets, but, just as importantly, it is apparent, as the trial court found, that KCL would incur additional costs associated with holding the assets, including maintenance expenses, cost of recovery, capital improvements, and expense of asset management. It was not unreasonable to approve and close the sales in light of the risk that KCL would ultimately receive less value from the assets by holding them over a longer period of time. We find no compelling evidence in this record that more enhanced prices could be achieved on this particular grouping (pooling) of assets through different asset management strategies.

■ When an insurance company gets into financial difficulties, something must be done to remedy the situation. The Commissioner need not wait until disaster deepens or until the insurer is hopelessly insolvent. It follows that a determination of insolvency is by reference to the statutory accounting principles. These principles mandate that conservative methods be employed in valuing the assets of an insurance company. *Meyers v. Moody*, 693 F.2d 1196 (1982). Under the advice and evaluations of recognized experts utilized by the Commissioner, the trial court did not err in holding that the real estate assets did not meet requirements of the mortgage industry. In essence, KCL's mortgage operations were hazardous, there being an excessive concentration of investments, insufficient return for mortgaged property, failure to consider mortgages in default, and an insufficiency of appraisals of mortgaged property. *See Kueckelhan v. Federal Old Line Insurance Company*, 69 Wash.2d 392, 418 P.2d 443 (1966).

■ Upon considering the extent of the review and precautionary steps taken by the Commissioner with the pool sales, the decision of the rehabilitator should not be reject-ed by the reviewing court unless the rehabilitator has abused that discretion. One of KCL's primary causes of insolvency was the condition of its mortgage portfolio. There appears to have been sufficient, competent evidence existing to support the discretion of using pool sales. *Kueckelhan v. Federal Old Line Insurance Company*, 74 Wash.2d 304, 444 P.2d 667 (1968); *Carpenter v. Pacific Mutual Life Insurance Company of California*, 10 Cal.2d 307, 74 P.2d 761 (1937), aff'd. sub nom. *Neblett v. Carpenter*, 305 U.S. 297, 59 S.Ct. 170, 83 L.Ed. 182 (1938).

■ Appellant advances a strong statement that KCL's rehabilitation is undermined by the pool sales of the real estate assets and the court's decision to permit the sales prior to rendering a decision on the liquidation petition results in a denial of KCL's right to due process. The record contains no evidence establishing that due process was denied. Court authority was granted April 6, 1994, placing a portion of KCL's real estate assets into eight pools or groups. These groups were marketed through competitive bidding processes with the rehabilitator reserving the right to reject any offer not deemed acceptable. It is noteworthy that the trial court itself retained the right to review and approve the bids and the terms of the sales contracts.

The marketing method, which was advertised nationally, and the solicitation of potential purchasers dispels appellant's argument of—"fire sale." Thirty-six registered bidders paid $25,000 each for the opportunity to perform due diligence investigations of the real estate assets. Due diligence reviews consist of time consuming and cost processes. The values were thus maximized, coupled with the plan to lower the investment risk. While the high bid for five of the eight pools was ultimately accepted, the remaining three pools were not sold, and retention of these properties was for subsequent rehabilitation. The group sales reflect returns of 67 cents on the dollar for the principal balance of the real estate assets sold. This recovery exceeds national averages of pool sales shown to be 52–53 cents on the principal balance. Through pool sales KCL has reduced its real estate investment to approximately 15 per-

cent of the total assets; a percentage found to be favorable among insuring entities that maintain real estate mortgage investments among its investment portfolios.

Some factual resume of the group sales is beneficial in disclosing the study and consideration of the concept. Not all of KCL's assets were included in the pool sales, as portions of the retained assets were manageable and reasonably capable of achieving greater yield. For example, real estate assets with a principal balance of $426 Million (which included Kincaid Towers) provided only that $214 million of this group of real estate assets be placed in the pool sales area. In effect, the asset management committee was not shown to be in a rush to judgment. The Commissioner's principal experts disclosed the composition of the pools and justification for accepting the bids obtained. For instance, Pool 1 consisted of the French Quarter Suites Hotel and related buildings. It appeared that the property owner was in bankruptcy and prior to the pool sale the Commissioner's experts had received a bid of $13.5 million for such property. In this instance, the pool sale price resulted in a sum of $15 million.

Pool 2 was comprised of performing assets having a principal balance outstanding of some $40 million. Fourteen million dollars represented the Campbell House Inn and the experts, knowing that hotel ownership can be an inherently risky and management intensive investment, included this property in the grouping. Of such remaining assets of this pool, some were undercollateralized and borrowers were either threatening bankruptcy or litigation. This group of loans bore fixed interest rates and, as interest rates would or may rise, the value of such loans inherently fall. The faulty underlying standards used with the initial loans and with some of them exceeding the value of the underlying real estate, created the basis for this particular pool sale. The bid received for this sale happened to equate to 90 percent of the principal balance of such loans.

Continuing, we find that Pool 4 consisted of nonperforming and REO loans with a principal balance of $46 million. It was shown that the real estate lacked sufficient cash flow wherewith to service loan obligations. Some land within this pool was without any material improvements. Admittedly, investment by insurance companies in unimproved land that provides no cash flow may be classified as a risky investment. Unfortunately, some of the landed loans included horse farms, with a concentration of these loans being in Kentucky.

Pool 5b included performing and nonperforming loans on low to mid-level income areas on condominium projects. Most of this real estate was similar to that of Pool 5a which did not receive bids deemed to be satisfactory. The patent danger of the Pool 5b loans was that should they to go into default and KCL be required to foreclose, then the company had no expectation of realizing a return upon such assets.

Pool 6 was comprised of 26 residential loans which could not be sold and bore a lower fixed rate, which in the current market of rising interest, anticipated a loss in value. Such properties were not qualified for government financing and the bid for this group, representing 88 percent of the principal balance, was recommended as a good price.

We concur with the trial court's conclusion that the Commissioner, as rehabilitator, had the authority to sell such assets as were involved in group sales and it is explicitly implied that arbitrariness did not exist as the sales were deemed to be in the best interest of KCL. Upon examination of the record we find the area of sales to be within the trial judge's discretion and we accept his conclusions. The findings are sustained by substantial evidence in the record and we decline to disturb them. See *Kueckelhan v. Federal Old Line Insurance Company*, 69 Wash.2d 392, 418 P.2d 443 (1966); *see also Kentucky Central Life Insurance Company v. Rozar*, 108 Ariz. 77, 492 P.2d 1184 (1972).

A deprivation of due process is not apparent in this case. Although this portion of the statutory process was the rehabilitation phase, about which there is strict limitation

of a board to participate, we find that there was participation by the board, its attorneys, experts, and witnesses throughout the evidentiary hearing, which included a right of investigation.

We affirm the June 24, 1994, order of Franklin Circuit Court with its findings of fact and conclusions of law.

All concur. Special Justice THOMAS P. LEWIS sitting for Chief Justice STEPHENS.